[S. F. No. 21805. In Bank. July 9, 1968.]

JOSEPH M. GERHARD, Plaintiff and Appellant, v. MARY STEPHENS et al., Defendants and Respondents.

[S. F. No. 21806. In Bank. July 9, 1968.]

KENNEDY-WEBER OIL COMPANY, INC., et al., Plaintiffs and Appellants, v. MARY STEPHENS et al., Defendants and Respondents; JOSEPH M. GERHARD, Defendant and Appellant.

[S. F. No. 21807. In Bank. July 9, 1968.]

IRA S. SOLOMON, as Administrator, etc., et al., Plaintiffs and Appellants, v. MARY STEPHENS et al., Defendants and Respondents.

[S. F. No. 21808. In Bank. July 9, 1968.]

HERBERT METTLER, as Executor, etc., et al., Plaintiffs and Appellants, v. MARY STEPHENS et al., Defendants and Respondents.

(Consolidated Cases.)

866

872

David B. Fyfe, Sullivan, Roche, Johnson & Farraher, Vincent J. Mullins and Daniel H. Dibert for Plaintiffs and Appellants and for Defendant and Appellant.

Philip T. Boyle, Bruce A. Richardson, Wyckoff, Parker, Boyle & Pope, C. Ray Robinson, Duane W. Dresser, J. T. Harrington, Arthur R. Albrecht, J. Carter Perkins, Michael Klynn, McCutchen, Doyle, Brown, Trautman & Enersen, Richard J. Archer, Robert D. Raven, William R. Berkman, Morrison, Foerster, Holloway, Clinton & Clark and Stefan A. Riesenfeld for Defendants and Respondents.

Edward D. Landels and Landels, Ripley, Gregory & Diamond as Amici Curiae on behalf of Defendants and Respondents.

TOBRINER, J.—Plaintiffs brought these four actions to quiet title to undivided mineral interests underlying section 31, township 16 south, range 11 east, Mt. Diablo base and meridian, in San Benito County (section 31). They claimed these interests as successors of stockholders in two now-defunct corporations, Ashurst Oil, Land and Development Company (Ashurst) and California Oil Products Company (COP), which obtained specified mineral rights in section 31 in 1910.

Joseph Gerhard (Gerhard), plaintiff in S.F. 21805, Ira Solomon and others (Solomon), plaintiffs in S.F. 21807, and Herbert Mettler and others (Mettler), plaintiffs in S.F. 21808,

claim interests in the mineral rights formerly held by Ashurst.[1] The Kennedy-Weber Oil Company and others (Weber), plaintiffs in S.F. 21806, claim interests in the mineral rights formerly held by both Ashurst and COP.[2]

Defendants[3] raised a number of defenses essentially based on their long occupation of the surface of section 31 and the failure of plaintiffs and their predecessors to assert these rights for 47 years until the time that defendants struck oil. The trial court entered judgment for defendants in each action, and plaintiffs appeal. We shall summarize the relevant facts and set forth additional matters as necessary in the body of the opinion.

In 1905 the Ashurst family conveyed the Syncline Ranch, which includes section 31, to Abrams and Brandt, who executed a purchase money mortgage for $17,500, which was assigned to the Hollister Savings Bank (Hollister Bank mortgage). Abrams and Brandt had organized two corporations, Ashurst and COP. To Ashurst they conveyed an estate in certain minerals underlying a portion of section 31, and to COP they conveyed a similar mineral estate underlying the remainder of section 31.[4] COP executed a mortgage for $21,610.82 to Abrams and Brandt as part of the purchase price (COP mortgage).

Ashurst drilled three dry wells on the property; COP did no drilling. COP in 1912 and Ashurst in 1915 forfeited their

---

[1]Gerhard claims as successor of various stockholders a 144,920-5/9/366,- 201¾ interest in the Ashurst mineral rights. Gerhard was named as a defendant in S.F. 21806 but is herein considered and referred to as a plaintiff for all purposes.

The Solomon plaintiffs claim as successors of Samuel Cohn a 17,879/ 366,201¾ interest in the Ashurst mineral rights.

The Mettler plaintiffs claim as successors of C.H.W. Brandt a 28,150/ 366,201¾ interest in the Ashurst mineral rights.

[2]The Weber plaintiffs claim as successors of Charles Weber a 33,527/ 366,201¾ interest in the Ashurst mineral rights and a 264,400/503,000 interest in the COP mineral rights.

[3]The successors of Antonio Frusetta and Warren Cornwell (Frusetta-Cornwell) are named as defendants in all actions. Plaintiffs concede that these defendants own the surface estate in section 31, a 114,811/366,201¾ interest in the Ashurst mineral rights, and a 199,500/503,000 interest in the COP mineral rights.

Shell Oil Company and Shell-Canadian Exploration Company (Shell), who are oil and gas lessees from the Frusetta-Cornwell defendants in section 31, are also defendants in S.F. 21806-21808.

[4]By the conveyance Ashurst obtained "all petroleum, coal oil, naptha, asphalt, maltha, brea, bitumen, natural gas and other kindred or similar substances and deposits and rocks, gravels or other formations containing or yielding any of said substances" lying underneath the designated portions of section 31. It also obtained the right to enter on the property with the necessary equipment and extract the described substances. The

corporate charters for nonpayment of taxes; the stockholders succeeded to the title of the corporate property.

In 1917 Brandt brought an action to quiet title to the Syncline Ranch. (Action 1870; San Benito County.) The court in 1923 quieted the title of Abrams and Brandt as a partnership in the surface estate in section 31 and in the portion of the mineral estate represented by the partnership's stock holdings. The court also found that Abrams and Brandt, as individual stockholders, obtained title to fractional interests in the mineral estate at the time the corporations forfeited their charters. It decreed all the stockholders, in proportion to their holdings, were "coowners" of the mineral estate subject to a trusteeship of the directors for liquidation and, in the case of the COP stockholders, subject to the lien of the COP mortgage held by the partnership of Abrams and Brandt. The court ordered the trustees to sell the corporate properties and pay the proceeds into court for the benefit of shareholders and creditors, but it does not appear that this order was ever carried out.

In 1919 Brandt brought an action (action 13948; San Joaquin County) for partnership accounting. The court ordered the partnership interest in the Syncline Ranch to be sold; this included the surface estate in section 31, an undivided 114,811/366,201¾ interest in the Ashurst mineral rights, an undivided 199,500/503,000 interest in the COP mineral rights and the COP mortgage. The court included in the decree a copy of a mortgage foreclosure decree in which the Hollister Bank mortgage had been foreclosed and a sale ordered of the Syncline Ranch to pay off the mortgage. The decree in action 13948 proceeded to state that Brandt had paid the Hollister Bank mortgage and, through his son-in-law Mettler, taken an assignment of the mortgage. The court in action 13948 appointed a commissioner, who sold the partnership interest in the Syncline Ranch to Halsey, Brandt's nephew.

In 1924, shortly after the commissioner's sale, Halsey conveyed to Antonio Frusetta, who had previously been a lessee

rights were transferred to the corporation, its successors and assigns forever.

COP obtained "all petroleum, coal oil, naptha, asphalt, maltha, brea, bitumen, natural gas and other kindred or similar substances and deposits and rocks, coal, minerals, gravels or other formations containing or yielding any of said substances . . . ." It also obtained the right to enter on the property with the necessary equipment and extract the described substances. The rights were transferred to the corporation, its successors and assigns forever.

of the Syncline Ranch, and Warren Cornwell[5] (1) the "whole" of section 31, "subject to" the deeds to Ashurst and COP, (2) the Abrams and Brandt partnership interest in the property conveyed to Ashurst and COP, and (3) the COP mortgage. It was from the proceeds of this transaction that the Hollister Bank mortgage held by Brandt had been discharged. Frusetta and Cornwell, who, prior to 1924, had leased the Syncline Ranch and used it for a cattle ranch, continued to use it for that purpose.

Henry Carroll in 1938 obtained a lease covering oil, gas, and other hydrocarbons from the Frusetta-Cornwell defendants but did not undertake any drilling. In 1951 Tillman Hess obtained another lease from these defendants; he drilled a dry hole on the Syncline Ranch; the drilling, however, by inadvertence, did not take place in section 31. Defendant Shell Oil Company obtained the Hess lease and other leases from the Frusetta-Cornwell defendants in 1951 and 1952.

The Frusetta-Cornwell defendants, in 1952, brought an action (action 5362) against "all persons unknown" to quiet title to "all of Section 31." None of the plaintiffs or their predecessors were named or served with process. Following publication of summons, the court in 1953 quieted title in the Frusetta-Cornwell heirs to "all of Section 31." In 1954 some of Cornwell's heirs brought an action (action 5591) to quiet title to an undivided one-half interest in section 31 against certain named heirs of Cornwell and "all persons unknown." As in action 5362, none of plaintiffs or their predecessors were named or served with process. The court quieted title to an undivided interest in section 31 subject to the Shell lease.

In 1956 Shell began drilling operations and struck oil on section 31. Plaintiff Gerhard, who had no connection with any of the transactions outlined above, read of the discovery and began investigating the title to section 31. Learning of the interests transferred to COP and Ashurst he approached the successors of the stockholders, obtained some of the claims, and instituted legal action. Other heirs of the stockholders brought separate actions. The trial court entered judgment in favor of defendants.

The trial court found that (1) plaintiffs had abandoned

[5]On the death of Frusetta in 1938 the decrees of distribution ordered distribution of an undivided one-half interest in section 31 to his heirs. The decree made no mention of the mineral estate. On Cornwell's death in 1947 the court entered a decree of distribution similar in regard to section 31 to that in the Frusetta estate.

their interest in the oil and gas and other fugacious minerals underlying section 31; (2) defendants had acquired title to all the mineral interests by adverse possession; (3) plaintiffs' claims were barred by laches; (4) plaintiffs' claims were barred by the decrees in actions 5362 and 5591. Plaintiffs challenge these findings and additionally claim that (5) they were deprived of their right to cross-examine George Frusetta, the son of Antonio Frusetta. (6) The Weber plaintiffs claim that the trial court erred in disallowing a class action. Defendants claim that the trial court's judgment must be sustained in any event (7) as to all plaintiffs because they had lost their right to redeem under the Hollister Bank mortgage, and, (8), as to plaintiff Gerhard, because he acquired his claims through the unlawful practice of law and through violations of the California Corporate Securities Act.

We summarize our holding as follows: (1) Substantial evidence sustains the trial court's finding that the predecessors of the Weber plaintiffs abandoned their interests in the minerals underlying section 31. As to the remaining plaintiffs, however, we find no such substantial evidence. (2) Defendants did not acquire title to the mineral interests by adverse possession. (3) Plaintiffs are not guilty of laches in asserting their claims. (4) The decrees in actions 5362 and 5591 do not bar plaintiffs' claims. (5) Plaintiffs were not deprived of their right to cross-examination. (6) The trial court could properly rule that the Weber plaintiffs could not bring a class action. (7) The Hollister Bank mortgage does not cover plaintiffs' interests in the minerals. (8) Defendants may not be heard to assert that plaintiff Gerhard illegally acquired his claims. Accordingly, we reverse the judgments in S.F. 21805, 21807, and 21808, and the judgment in S.F. 21806 as to Joseph M. Gerhard. We affirm the judgment in S.F. 21806 as to all parties other than Gerhard.

### 1. *Abandonment*

#### A. *Plaintiffs' interests are subject to abandonment.*

The trial court found that "the interests in section 31 claimed by plaintiffs . . . to the oil, gas and other fugacious minerals have been abandoned." Plaintiffs challenge the propriety of this finding. They point to the general rule that legal title to a fee simple can never be abandoned. They now claim ownership of such an estate in the fugacious minerals underlying section 31 and accordingly conclude that such an estate could not be abandoned. Defendants, on the other hand, rely on the general rule that property interests in the nature

of *incorporeal hereditaments* can be abandoned. They so categorize the interests obtained by plaintiffs' predecessors in the fugacious minerals and therefore contend that these rights are subject to abandonment.

Our courts have not spoken on this precise question. Since, however, the question involves title to interests in real property we must, if possible, find our solution within the rich but rigid context of the historical background of the common law and the California cases. As we explain, however, not only the precedents but also the considerations underlying these precedents lead to the identical conclusion : these interests may be abandoned.

We shall point out that Abrams and Brandt conveyed to the corporations the exclusive and perpetual privilege of drilling for oil and gas. Under California law we classify such an interest as a profit *a prendre,* an incorporeal hereditament. We then explain that profits *a prendre* are essentially indistinguishable from easements and, thus, like easements and other incorporeal hereditaments they can be abandoned. In so holding we reject plaintiffs' argument that since California cases describe a perpetual profit *a prendre* as an ''estate in fee'' such a perpetual interest is not subject to abandonment under the general rule that ''fee interests'' in real property cannot be abandoned; the cases have used the term fee interest'' in two different contexts : (a) to indicate the perpetual nature of the interest; (b) to indicate the possessory, or corporeal, nature of the interest. The cases in which the courts have declared that a ''fee interest'' cannot be abandoned use the term in the latter sense; the cases that hold that a perpetual profit is a ''fee interest'' use the term in the former sense.

In support of our conclusion we note that the historical reason for the refusal of courts to recognize abandonment of certain interests in real property—the possibility of voids in titles—does not apply here. To the contrary the recognition that holders of ancient titles and their successors may abandon such interests tends to improve the marketability of titles. It removes encrusted impediments to titles and thus permits the present-day sale and disposition of land so that this prime resource may be utilized to the maximum.

1. *The deeds gave to plaintiffs the exclusive privilege of drilling for oil and gas, which constitutes a profit a prendre, an incorporeal hereditament.*

We begin with consideration of the leading case of

*Callahan* v. *Martin* (1935) 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871]. In that case this court definitively resolved the conflict in the early California cases as to the nature of ownership of oil and gas interests in this state. (See Colby, *The Law of Oil and Gas* (1943) 31 Cal.L.Rev. 357, 384-402.) We there rejected the view held by the majority of concerned jurisdictions that the assignee of an oil and gas interest possesses a defeasible fee in definite corporeal real property. (See, e.g., *Texas Co.* v. *Daugherty* (1915) 107 Tex. 226 [176 S.W. 717, L.R.A. 1917F 983]; see also 1 Williams & Meyers, Oil and Gas Law, § 203.3; 1 Kuntz, Oil & Gas, § 2.4, p. 66.) The concept of the defeasible fee, we held, did not sufficiently recognize the practical difference between oil and gas and solid minerals: the latter remain in place beneath the surface of land, but the former, fugacious and vagrant, may be drawn from beneath the surface of other lands. (3 Cal.2d at pp. 116-117.)

We held that "an operating lessee under a lease for a term of years . . . has an interest or estate in real property in the nature of a profit *a prendre,* which is an incorporeal hereditament, and that the assignee of a royalty interest in oil rights under an assignment by the landowner[6] also has an interest or estate in real property in the nature of an incorporeal hereditament." (P. 118.)[7] We further stated, "The holders of oil interests under a landowner's assignments have rights of profit *a prendre,* which are estates in real property, and are properly described as real property, or real estate, where, as in the instant case, they are to endure in perpetuity." (Pp. 127-128.)

In *Dabney-Johnston Oil Corp.* v. *Walden* (1935) 4 Cal.2d 637 [52 P.2d 237], we further elaborated the California posi-

[6]Although the court in *Callahan* terms the assignee's interest a "royalty interest," it was similar to those created in the instant case. We construed the conveyance in *Callahan* as giving the assignee the right, subject to any outstanding leases, to enter on the property, drill for, and produce oil.

[7]The term "corporeal hereditament" generally refers to tangible real property. (73 C.J.S., Property, § 7, p. 167; cf. *Callahan* v. *Martin, supra,* 3 Cal.2d at p. 119.) An incorporeal hereditament is a right stemming from a corporeal thing. (73 C.J.S., Property, § 7, p. 168.) It may relate to land, in which case it constitutes "a limited interest or estate in land . . . . Where this limited interest is to endure in perpetuity or for life, it is a freehold interest, and real property or real estate, as well as an estate in real property." (*Callahan* v. *Martin, supra,* 3 Cal.2d at p. 120.)

A profit *a prendre* is an incorporeal hereditament; it is a right to take something from the land of another. (*Callahan* v. *Martin, supra,* 3 Cal.2d at p. 120; see, e.g., *Costa* v. *Fawcett* (1962) 202 Cal.App.2d 695, 702 [21 Cal.Rptr. 143] (right to go on land and harvest annual nut crop).)

tion. "The owner of land has the exclusive right on his land to drill for and produce oil. This right inhering in the owner by virtue of his title to the land is a valuable right which he may transfer. *The right when granted is a profit a prendre, a right to remove a part of the substance of the land. A profit a prendre is an interest in real property in the nature of an incorporeal hereditament. . . .* The profit *a prendre,* whether it is unlimited as to duration or limited to a term of years, is an estate in real property. If it is for a term of years, it is a chattel real, which is nevertheless an estate in real property, although not real property or real estate. [Citation omitted.] Where it is unlimited in duration, it is a freehold interest, an estate in fee, and real property or real estate. Thus, although the oil and gas in place doctrine is rejected, interests in oil rights which are estates in real property may be granted separate and apart from a grant of surface title." (Italics added.) (P. 649.)

With this background we proceed to analyze the grants to the two corporations. We have no doubt that Abrams and Brandt purported to convey to the corporations the entire interest of the partnership in the oil, gas, and other hydrocarbonic substances underlying section 31. As we pointed out in *La Laguna Ranch Co.* v. *Dodge* (1941) 18 Cal.2d 132 at page 135 [114 P.2d 351, 135 A.L.R. 546], however, "[T]he owner of land does not have an absolute title to the oil and gas in place as corporeal real property, but rather has the 'exclusive right' to drill for oil and gas upon his premises." (See *Bernstein* v. *Bush* (1947) 29 Cal.2d 773, 778 [177 P.2d 913] ; *Tanner* v. *Title Ins. & Trust Co.* (1942) 20 Cal.2d 814, 819 [129 P.2d 383] ; *Caffroy* v. *Fremlin* (1961) 198 Cal.App.2d 176, 182 [17 Cal.Rptr. 668].) [8] Since an owner may not effectively transfer rights in property greater than those he himself is

---

[8] In *Graciosa Oil Co.* v. *County of Santa Barbara* (1909) 155 Cal. 140 at page 144 [99 P. 483, 20 L.R.A. N.S. 211], we stated: "[A]n absolute estate in an underlying [oil] stratum may be created and the estate of the owner of the overlying land and of the owner of the subterranean stratum will be as distinct and separate as is the ownership of respective owners of two adjoining tracts of land. For purposes of separate ownership land may be divided horizontally as well as superficially and vertically." (See also *Nevada Irr. Dist.* v. *Keystone Copper Corp.* (1964) 224 Cal.App.2d 523, 526-527 [36 Cal.Rptr. 775] (*nonfugacious minerals*); *Red Bluff Developers* v. *County of Tehama* (1968) 258 Cal.App.2d 668, 672 [66 Cal.Rptr. 229] (quoting *Nevada Irr. Dist.*).) In *Callahan,* however, we indicated that this language in *Graciosa* suggested approval of the "oil and gas in place doctrine" (3 Cal.2d at p. 117); we rejected this theory of ownership and instead followed the approach taken in other early California cases that an owner could not hold "absolute title to oil and gas in place as corporeal real property . . . ." (*Id.*)

able to enjoy (23 Am.Jur.2d, Deeds, § 289), the corporations received no title to the oil and gas as corporeal real property but rather obtained the exclusive privilege of drilling for these substances.[9] This right, as explained by *Callahan* and *Dabney-Johnston*, is a profit *a prendre*, an incorporeal hereditament. Since the right is to endure in perpetuity, it is a "freehold interest, an estate in fee, and real property or real estate."

2. *Plaintiffs' perpetual profits a prendre, like easements, are subject to abandonment.*

Following the common law this court has classified profits *a prendre*, together with easements, as incorporeal hereditaments. (*Callahan* v. *Martin, supra*, 3 Cal.2d 110, 118; *Schiffman* v. *Richfield Oil Co.* (1937) 8 Cal.2d 211, 223 [64 P.2d 1081].) As we shall point out, for the purposes of the issue now before us, easements and profits *a prendre* are indistinguishable. "[T]he term 'easement' is so used [in the Restatement of Property] as to include within its meaning the special meaning commonly expressed by the term 'profit.' . . . In phrasing the rules applicable to each of these interests it has been found . . . that in no case was there a rule applicable to one of these interests which was not also applicable to the other. . . ." (Rest., Property, § 450, Note; *Costa* v. *Fawcett* (1962) 202 Cal.App.2d 695 [21 Cal.Rptr. 143];[10] Civ. Code, § 802.[11])

Substantiating the Restatement's conclusion, we explain

[9]In *Dabney-Johnston Oil Corp.* v. *Walden, supra*, 4 Cal.2d 637, plaintiff argued that since the conveyance as reformed purported to give absolute title to the subterranean oil and gas, it transferred *no* rights because California recognized no such property interest. We held, however, that the grantors intended to convey the right to drill for and produce oil and gas and, therefore, that the deed could take effect as a conveyance of a profit *a prendre*. (P. 650.)

[10]In *Costa* defendant claimed to have acquired a profit *a prendre* by adverse user. The court followed the rule applicable to acquisition of *easements* by adverse user; it held that the burden of proof as to the assessment of taxes against the interest was on the party resisting the adverse claim. The court declined to follow the contrary rule, applicable "to the acquisition of the fee, as distinguished from an easement . . . ." (P. 701.)

[11]Civil Code section 802 classifies profits and easements *in gross*, identically, as servitudes: "The following land burdens, or servitudes upon land, may be granted and held, though not attached to land: One. The right to pasture, and of fishing and taking game. Two. The right of a seat in church. Three. The right of burial. Four. The right of taking rents and tolls. Five. The right of way. Six. The right of taking water, wood, minerals, or other things." (See *Callahan* v. *Martin, supra*, 3 Cal.2d 110, 121.)

that *Callahan* and *Dabney-Johnston* in defining the nature of a perpetual profit *a prendre,* such as the one involved in the instant case, employed language equally descriptive of a perpetual easement. Thus *Dabney-Johnston Oil Corp* v. *Walden, supra,* 4 Cal.2d 637 at p. 649, holds that " [w]here [the profit] is unlimited in duration, it is a freehold interest, an estate in fee, and real property or real estate.''

The California cases have long held that these attributes, employed in *Dabney-Johnston* to describe a profit, are also characteristic of other perpetual incorporeal hereditaments. Thus in *Appeal of North Beach & M. R.R. Co.* (1867) 32 Cal. 499, for instance, this court described at some length the nature of an easement: " [A]n easement is property . . . an incorporeal hereditament, but it is still a tenement and an interest in the land. '. . . The interest of an easement may be freehold, or a chattel one, according to its duration.' (Wash, On Easements, 5, par. 5.) 'An easement must be an interest in, or over the soil.' (Per Cresswell, J., in *Rowbotham* v. *Wilson* 8 Ellis and B. 157.) 'A right of way is an assignable property. It is a real, or chattel interest, according to the term of its duration, and the former is well known in the law as that sort of real property belonging to the class of incorporeal hereditaments.' (*Ex parte Coburn,* 1 Cow. 570; *Heaton* v. *Ferris,* 1 John 146.) It is real property, and it is created by grant.'' (P. 506.) We also noted that appellant railroad's easement was " an interest in the land—and . . . real estate . . . .'' (P. 512.) (See also *Corea* v. *Higuera* (1908) 153 Cal. 451, 454 [95 P. 882, 17 L.R.A. N.S. 1018]; *Roth* v. *Cottrell* (1952) 112 Cal.App.2d 621, 625 [246 P.2d 958]; *Balestra* v. *Button* (1942) 54 Cal.App.2d 192, 198 [128 P.2d 816], for descriptions of perpetual easements as real property; *Crowell* v. *City of Riverside* (1938) 26 Cal.App.2d 566, 579 [80 P.2d 120]; *Guy* v. *Brennan* (1923) 60 Cal.App. 452, 454 [213 P. 265].)

Furthermore, " [T]he interest in land which an easement constitutes is real property and itself may be held in fee simple . . . .'' (*Highland Realty Co.* v. *City of San Rafael* (1956) 46 Cal.2d 669, 677 fn. 1 [298 P.2d 15]; *Appeal of North Beach & M. R.R. Co., supra,* 32 Cal. 499, 509; *City of Glendora* v. *Faus* (1957) 148 Cal.App.2d 920, 921 [307 P.2d 976]; *Ocean Shore R.R. Co.* v. *Doelger* (1954) 127 Cal.App.2d 392, 398-399 [274 P.2d 23]; *Irvin* v. *Petitfils* (1941) 44 Cal. App.2d 496, 500 [112 P.2d 688]; *Eastman* v. *Piper* (1924) 68

Cal.App. 554, 562 [229 P. 1002]; 17 Cal.Jur.2d, Easements, § 2, pp. 90-91.)[12]

Thus, as we have noted, the cases have described the perpetual easement and the perpetual profit in identical terms and have treated these interests identically. (See *Costa* v. *Fawcett, supra,* 202 Cal.App.2d 695; Rest., Property, § 450, Note.) Although no California authority precisely states whether the perpetual profit may be abandoned, we submit that the cases discussing abandonment of perpetual easements created by grant in real property disclose the appropriate rule.

The cases have held that perpetual easements created by grant in real property *can* be abandoned. (*People* v. *Southern Pac. Co.* (1916) 172 Cal. 692, 701 [158 P. 177]; *Smith* v. *Worn* (1892) 93 Cal. 206, 212 [28 P. 944]; *Buechner* v. *Jonas* (1964) 228 Cal.App.2d 127, 131 [39 Cal.Rptr. 298]; *Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co.* (1962) 206 Cal.App.2d 421, 436 [23 Cal.Rptr. 881]; *Ocean Shore R.R. Co.* v. *Doelger* (1960) 179 Cal.App.2d 222, 231 [3 Cal.Rptr. 706]; *Haley* v. *Los Angeles County Flood Control Dist.* (1959) 172 Cal.App.2d 285, 291 [342 P.2d 476]; *Ocean Shore R.R. Co* v. *Doelger, supra,* 127 Cal.App.2d 392, 403; see Rest., Property, § 504, com. a.)

We conclude that profits, like easements, can be abandoned (see *Miller* v. *State* (1936) 121 Conn. 43, 48 [183 A. 17] (plaintiff abandoned his right to remove rock); *Mathews Slate Co.* v. *Advance Industrial Supply Co.* (1918) 185 App. Div. 74, 79 [172 N.Y.S. 830]). In so holding, we follow the general rule that all incorporeal hereditaments can be abandoned. (1 Am.Jur.2d, Abandoned Property, § 14; 1 C.J.S., Abandonment, § 5(c); see 1 Cal.Jur.2d, Abandonment, § 9.)

As the leading authorities in the field of oil and gas law, Professor Williams, Dean Maxwell, and Professor Meyers, have declared, such perpetual profits *a prendre,* constituting incorporeal hereditaments, were subject to abandonment. "At common law, incorporeal estates but not corporeal estates were subject to extinguishment by abandonment. If the mineral grantee or lessee has merely an incorporeal estate, then the courts may be able to clear the title of the interest of such grantee or lessee who makes no effort for a long period of time

---

[12]See also *Texas Co.* v. *O'Meara* (1941) 377 Ill. 144, 149 [36 N.E.2d 256]; *Branson* v. *Studabaker* (1892) 133 Ind. 147, 164-165 [33 N.E. 98]; *Shea* v. *Inspector of Buildings of Quincy* (1949) 323 Mass. 552, 555 fn. 1 [83 N.E.2d 457]; *Goldman* v. *Beach Front Realty Co.* (1912) 83 N.J.L. 97, 99 [83 A. 777].

to produce minerals from the land by holding that his non-action is sufficient evidence of intent to abandon his incorporeal interest.'' (Williams, Maxwell, Meyers, Cases and Materials on the Law of Oil and Gas (1st ed. 1956) ; see also 1 Williams & Meyers, Oil & Gas Law, § 210.1; Smith, *Methods for Facilitating the Development of Oil and Gas Interests* (1964) 43 Tex.L.Rev. 129, 161; cf. Woodward, *Ownership of Interests in Oil and Gas* (1965) 26 Ohio St.L.J. 353, 365-366.)

The property law of this state thus compels the conclusion that the perpetual profits *a prendre* here involved are subject to abandonment.

3. *The cases which hold that a ''fee interest'' cannot be abandoned use the term in its possessory rather than durational sense; cases using ''fee interest'' in describing an incorporeal hereditament refer only to its duration and do not hold that it cannot be abandoned.*

We next demonstrate the fallacy in plaintiffs' argument that, since *Callahan* and *Dabney-Johnston* describe a *perpetual* profit as a ''fee interest,'' the interest is because of its ''fee'' nature not subject to abandonment. We shall explain that in *Callahan* and *Dabney-Johnston* the court used the term ''fee'' to designate merely the duration of the estate; this designation in no way alters our conclusion that a perpetual incorporeal hereditament can be abandoned.

It is true, as plaintiffs point out, that many California cases have declared that a *fee simple* interest in *real property* may not be abandoned. ''And indeed, regarding the title passing by virtue of the ordinance, as a title in fee, neither abandonment or disclaimer has any application to or effect upon such title or the right to the possession following therefrom.'' (*Davis* v. *Perley* (1866) 30 Cal. 630, 636; *Davenport* v. *Turpin* (1872) 43 Cal. 597, 602, overruled on other grounds, *Burns* v. *Hiatt* (1906) 149 Cal. 617, 625-626 [87 P. 196, 117 Am.St.Rep. 157] ; *Ferris* v. *Coover* (1858) 10 Cal. 589, 631; *Hunter* v. *Schultz* (1966) 240 Cal.App.2d 24, 28 [49 Cal.Rptr. 315] ; *Kern County Land Co.* v. *Nighbert* (1925) 75 Cal.App. 103, 106 [241 P. 915].)[13] As we have pointed out *ante,* at pages 881-882, the courts have also held, however, that per-

[13]Cf. *Carden* v. *Carden* (1959) 167 Cal.App.2d 202, 209 [334 P.2d 87] (equitable interest in land *can* be abandoned) ; *Romero* v. *Brewer* (1943) 58 Cal.App.2d 759, 763 [137 P.2d 872] (oil and gas lease can be abandoned) ; *Northern Assur. Co.* v. *Stout* (1911) 16 Cal.App. 548, 557 [117 P. 617] (defendant could not abandon the land but forfeited it).

petual easements in real property are also "fee interests" yet that such interests *can* be abandoned.[14]

◼ The explanation of the superficial disparity in the consequences of ownership of these interests in real property becomes clear when we consider that our courts have employed the term "fee" to describe two different concepts.[15] (See *Highland Realty Co.* v. *City of San Rafael, supra,* 46 Cal.2d 669, 677 fn. 1.) In one sense the courts use "fee" to describe the totality of the *possessory and corporeal* rights of ownership in real property. Hence in some cases they have spoken of a *fee* interest as distinguished from an *easement.* (E.g., *Southern Pac. R.R. Co.* v. *San Francisco Sav. Union* (1905) 146 Cal. 290 [79 P. 961, 106 Am.St.Rep. 36, 2 Ann.Cas. 962, 70 L.R.A. 221] (owner of *fee* burdened with an *easement* may be entitled to award in eminent domain); *Faus* v. *City of Los Angeles* (1961) 195 Cal.App.2d 134 [15 Cal. Rptr. 783] (railroad took *fee* rather than easement for right of way and therefore owned mineral rights); *Ocean Shore R.R. Co.* v. *Doelger, supra,* 127 Cal.App.2d 392, 402 fn. (if right of way held in fee rather than easement it cannot be abandoned; i.e., if the railroad owns the land rather than merely the right to use the land, the right of way cannot be abandoned); see generally 6 A.L.R.3d 973.)

On the other hand, the courts describe fee ownership as any

---

[14]Plaintiffs suggest that the long series of *Ocean Shore* cases, involving the question of the railroad's abandonment of its right of way, do not support the proposition that an incorporeal hereditament held "in fee" can be abandoned. They claim that the railroad held title in "fee simple *determinable,*" that the deeds granted the right of way *so long as* it was used for railroad purposes. Thus, they reason, the railroad could lose this right by discontinuing its operations.

As our cases point out, however, the grant was "in perpetuity [for] a right of way for railroad purposes only." (*Ocean Shore R.R. Co.* v. *Doelger, supra,* 127 Cal.App.2d 392, 400; *Ocean Shore R.R. Co.* v. *Spring Valley Water Co.* (1927) 87 Cal.App. 188, 191 [262 P. 53]; see *People* v. *Ocean Shore R.R., Inc.* (1948) 32 Cal.2d 406, 418-419 [196 P.2d 570, 6 A.L.R.2d 1179].) Under such deeds the railroad had the right to use the land for purposes consistent with the grant. But it also possessed the right *not* to use the land for any purposes so long as it did not intend to "forswear all future conforming uses." (*Faus* v. *City of Los Angeles* (1967) 67 Cal.2d 350, 363-364 [62 Cal.Rptr. 193, 431 P.2d 849].) Thus the railroad stopped running trains in 1921. If plaintiffs' position were correct, the railroad would have lost ownership of the right upon cessation of service, and our courts would have had no reason to entertain the railroad's claim to ownership for 41 years following the discontinuance of railroad operations.

[15]We rarely find occasion to employ the term "fee" in a third sense, its most traditional meaning: indicating possessory rights in land held of someone else as contrasted with allodial ownership. (See 1 Co. Litt. *1a.-1b.; 2 Blackstone, Commentaries *104-105.)

estate of inheritance. (Civ. Code, § 762; [16] *Burnett* v. *Piercy* (1906) 149 Cal. 178, 190 [86 P. 603].) In *In re Barlow* v. *Security Trust & Sav. Bank* (1925) 197 Cal. 263 at p. 266 [240 P. 19], we explained, " 'Fee simple' therefore merely means that the interest of a given estate is inheritable and not subject to 'conditions or collateral determination.' Nor is the inheritable quality of the estate at all affected by the nature thereof." We quoted Blackstone's explanation: "Taking, therefore, *fee* . . . as a state of inheritance, it is applicable to, and may be had in any kind of hereditaments, either corporeal or incorporeal . . . . The *dominicum* or property is frequently in one man, while the appendage or service is in another. Thus Gaius may be seised *as of fee* of a way leading over the land, of which Titius is seised *in his demesne as of fee*."[17] (2 Blackstone, Commentaries *106, 107.)

The holdings in *Callahan* and *Dabney-Johnston* clearly negate the possibility that this court used the description "fee" as an indication of anything but the *duration* of the interests. Thus *Dabney-Johnston* speaks of a profit held in fee in contradistinction to one held for a term of years. (4 Cal.2d 637, 649.) And the thrust of *Callahan* is that the holder of a profit to remove oil and gas enjoys no definitive possessory ownership of these substances until they are severed from the realty and become personal property.

We conclude that the rulings in the cases cited at page 23, *supra*, that a "fee" interest in real property cannot be abandoned are explicable only upon an analysis of the facts

[16]That section provides: "Every estate of inheritance is a fee, and every such estate, when not defeasible or conditional, is a fee simple or an absolute fee."

[17]Cases from other jurisdictions illustrate this point with particular relevance to the instant question. "The words in the tenendum clause under consideration, 'forever, in fee simple,' do not demand the construction contended for by plaintiff in error. . . . The words 'fee simple' are descriptive of the extent of duration of the easement." (*Atlanta, B. & A. Ry. Co.* v. *Coffee County* (1921) 152 Ga. 432, 434 [110 S.E. 214].) Accordingly, the court goes on to conclude that the easement could be and was abandoned. In *Mammoth Cave Nat. Park Assn.* v. *State Highway Com.* (1935) 261 Ky. 769 [88 S.W.2d 931], the court concluded that the deed of a right of way conveyed an easement, rather than a "fee," and that therefore the right of way could be abandoned. "The fact that . . . the right acquired was designated as a fee is not controlling, but, when considered in connection with other parts of the instruments, clearly indicates a purpose and intention to convey a continuous and perpetual right, title, and use of the land so long as it was devoted to the purposes for which it was acquired." (P. 775; see *Tompkins* v. *Atlantic Coast Line R. Co.* (1953) 89 Ga.App. 171, 176 [79 S.E.2d 41]; see also *East Alabama Ry. Co.* v. *Doe* (1885) 114 U.S. 340, 350 [29 L.Ed. 136, 139-140, 5 S.Ct. 869].)

involved in the particular cases; in each case the court concerned itself with title to corporeal real property. Thus these cases are entirely consistent with the cases we follow here, holding that easements "in fee" may be abandoned.

■ To summarize, we look to the *nature* of the interest as well as its *duration* to define plaintiffs' rights. Incorporeal interests, as distinguished from corporeal ones, may be abandoned, whatever their life, whether limited or unlimited in time, whether "fee" or a term, whether perpetual or restricted. In short, the temporal life of the hereditament does not tell us for this purpose what *kind* of a legal interest it is; we must classify it according to its genus, not merely its durational characteristic.

4. *Principle and policy support the conclusion that plaintiffs' interests are subject to abandonment.*

■ Although the historical rationale for the rule that certain interests in real property cannot be abandoned finds little articulation in the cases, the reason appears to be that society cannot tolerate voids in the ownership of land. (2 American Law of Property, Easements, § 8.98, p. 304.)[18] As stated by the court in *Kern County Land Co.* v. *Nighbert, supra,* 75 Cal.App. 103 at p. 108, "The title to land is not a nebulous thing; it must rest somewhere."[19] No such abeyance in ownership arises, however, if the owner of a perpetual profit

---

[18]*Davenport* v. *Turpin, supra,* 43 Cal. 597, 602, states that the reason for the rule precluding abandonment is that to hold otherwise would permit a landowner to relinquish his property in violation of the statute of frauds. A landowner, however, may be stripped of his title without the formality of a writing signed by him, e.g., by adverse possession or forfeiture. Moreover, although a conveyance of an easement must comply with the statute of frauds (*Appeal of North Beach & M. R.R. Co., supra,* 32 Cal. 499, 506; *Oliver* v. *Burnett* (1909) 10 Cal.App. 403, 408-409 [102 P. 223]) our courts, in permitting easements to be abandoned, have not considered the statute of frauds an insurmountable difficulty.

[19]This rationale probably stems from feudal society's disinclination to tolerate an abeyance of seisin. "But a state of abeyance was always odious, and never admitted but from necessity, because in that interval, there could not be any seisin of the land, nor any tenant to the *praecipe,* nor any one of the ability to protect the inheritance from wrong, or to answer for its burdens and services. . . . The title if attacked, could not be completely defended, because there was no one in being whom the tenant could pray *in aid* to support his right . . . . The particular tenant could not be punishable for waste, for the writ of waste could only be brought by him who was entitled to the inheritance. So many operations of law were suspended by this sad theory of an estate in abeyance that great impediments were thrown in the way of it, and no acts of the parties were allowed to put the immediate freehold in abeyance by limiting it to commence *in futuro;* and we have seen, that one ground on which the rule in Shelley's case is placed, was to prevent an abeyance of the estate." (4 Kent, Commentaries *259.)

chooses to abandon his interest. Comment (a) to section 504 of the Restatement of Property states: ''That there is an ownership ready to take the benefit resulting from an abandonment of an easement is the probable explanation of the tolerance of the law toward the abandonment of such interests. In many cases, of which the ownership of land in fee is an example, an abandonment, if permitted, would result in a void in the ownership of the affected thing, the filling of which would be largely a question of chance and would probably produce grave uncertainty of title.'' (Cf. 2 Pollock & Maitland, History of English Law (1895) 80.)

If interests in real property can be and are abandoned, they do not become, as in the case of personal property, the property of the first appropriator (see 1 Cal.Jur.2d, Abandonment, § 10), but instead return to the estate out of which they were carved. The abandonment of a profit *a prendre,* therefore, because the profit in essence is an easement, does not become subject to the void in ownership that the common law of land title sought to avoid. If a perpetual right of way or other easement is abandoned, the property interest reverts to the servient estate (*Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co., supra,* 206 Cal.App.2d 421, 438). Similarly, a perpetual right to remove oil and gas (see Civ. Code, §§ 801, 802) would ordinarily revert to the surface estate,[20] thereby freeing that estate of its burden and permitting its owner more complete utilization and enjoyment of his property. (See *Miller* v. *State, supra,* 121 Conn. 43, 48; *Mathews Slate Co.* v. *Advance Industrial Supply Co., supra,* 185 App. Div. 74; see also Rest., Property, § 450, Note.)

Commentators have noted that ''The abandonment concept, when applied, frequently serves the very useful purpose of clearing title to land of mineral interest of long standing, the existence of which may impede exploration or development of the premises by reason of difficulty of ascertainment of pres-

---

[20]We state no absolute rule on this point because under certain circumstances not present here it may not apply. Thus, if the grantor carves out a perpetual profit to remove oil and gas and later conveys to another the fee ownership in an underground corporeal stratum (see, e.g., *Nevada Irr. Dist.* v. *Keystone Copper Corp., supra,* 224 Cal.App.2d 523), upon abandonment by the profit holder the ownership of the oil and gas removed from the stratum might well rest in the subsurface owner.

We further recognize the possibility, not discussed by the parties, that when an incorporeal hereditament is held in cotenancy, the interest abandoned by one or more cotenants might revert to the remaining cotenants instead of to the servient estate. In view, however, of plaintiffs' pleadings we decline to comment on this possibility at this time.

ent owners or of difficulty of obtaining the joinder of such owners."[21] (1 Williams & Meyers, Oil and Gas Law, § 210.1, pp. 104-105, see also Smith, *Methods for Facilitating the Development of Oil and Gas Lands Burdened with Outstanding Mineral Interests, supra,* 43 Tex.L.Rev. 129, 129-136; Street, *The Need for Legislation to Eliminate Dormant Royalty Interests* (March 1963) 42 Mich. State B.J. 49; cf. Audrain, *Title Insurance of Oil and Gas Leases* (1956) 3 U.C.L.A. L.Rev. 523, 530.)[22]

As stated in *Dabney-Johnston,* "the use of different terms of description may give rise to different legal incidents . . . ." (4 Cal.2d at p. 649.) By describing rights identical to those granted to the corporations as incorporeal hereditaments our court foreordained the conclusion we now reach. Moreover, a ruling that incorporeal hereditaments of the type

---

[21]Several jurisdictions, confronted, perhaps more frequently, with this problem have enacted legislation designed to terminate dormant oil and gas interests, whether limited or unlimited in duration, following a specified period of nonuse or failure to rerecord the interests. (La. Stat. Ann. Civil Code, arts. 789, 3546 (10 years); Mich. Stats. Ann., § 26.1163(1) (20 years); Tenn. Code Ann., § 64-704 (10 years); Va. Code Ann., §§ 55-154, 55-155 (35 years).)

[22]Reviewing the cases in those jurisdictions whose courts have had occasion to consider this question, we find no universally established rule contrary to the one we adopt. The Wyoming Supreme Court holds that an oil and gas lease is a profit *a prendre;* it reasons that since a profit is an incorporeal hereditament, it can be abandoned. (*Boatman* v. *Andre* (1932) 44 Wyo. 352, 362 [12 P.2d 370].) Illinois, which the commentators declare follows a theory of ownership similar to that enunciated in *Callahan,* holds that an unlimited interest in oil and gas may not be lost by abandonment. (*Jilek* v. *Chicago, etc. Coal Co.* (1943) 382 Ill. 241, 253-254 [47 N.E.2d 96, 146 A.L.R. 871]; see 1 Williams & Meyers, *op. cit. supra,* § 203, p. 31.) Other states, which may also be classified as adopting the "nonownership" rule, have held that an oil and gas interest may not be lost by mere nonuser. (*Piney Oil & Gas Co.* v. *Scott* (1934) 258 Ky. 51, 63 [79 S.W.2d 394]; *Noble* v. *Kahn* (1952) 206 Okla. 13, 16 [240 P.2d 757, 35 A.L.R.2d 119]; *Gill* v. *Fletcher* (1906) 74 Ohio St. 295 [78 N.E. 433, 113 Am.St.Rep. 962] (gypsum and plaster); see 1 Williams & Meyers, *op. cit. supra,* § 203, p. 31.) Since both nonuser and intent to abandon must concur in order to produce abandonment of an incorporeal hereditament (*Smith* v. *Worn, supra,* 93 Cal. 206, 212), these cases are consistent with our holding. Three states, which are generally recognized as adherents of the "absolute ownership" theory, refuse to permit the owner of an oil and gas interest to abandon it or to lose it by nonuser. (*Hillegust* v. *Amerada Petroleum Corp.* (Tex. Civ. App. 1955) 282 S.W.2d 892, 897 (cannot abandon fee simple determinable interest); *Sanford* v. *Alabama Power Co.* (1951) 256 Ala. 280, 288 [54 So.2d 562] (following severance a mineral estate is a *corporeal* hereditament and cannot be lost by mere nonuser); *Bodcaw Lbr. Co.* v. *Goode* (1923) 160 Ark. 48, 61 [254 S.W. 345; 29 A.L.R. 578] (mineral interest cannot be lost by nonuser); see 1 Williams & Meyers, *op. cit. supra,* § 203, p. 31.) In none of the cases above cited did the courts elaborate on the problem herein involved; we find no discussion or analysis to assist us.

involved here may be abandoned tends to promote the marketability of title by facilitating the clearing of titles. To that extent it better fulfills the demands of a modern economic order. Further, it reduces the possibility of the resurrection of the ghosts of abandoned claims by which title searchers and forgotten owners collect the windfalls of accidental profit.

In recognizing the freedom of an owner of an unlimited profit *a prendre* to abandon his interest, we realize, of course, that factual issues may determine the ownership of such interests.　　　The establishment of title by the resolution of factual, as opposed to legal, questions, however, does not create undesirable uncertainty as to the ownership of real property, since trial courts and juries must frequently make such resolutions determinative of title. (E.g., *Masterson* v. *Sine* (1968) *ante*, p. 222 [65 Cal.Rptr. 545, 436 P.2d 561]; *Ernie* v. *Trinity Lutheran Church* (1959) 51 Cal.2d 702, 707-708 [336 P.2d 525]; *People* v. *Ocean Shore R.R., Inc., supra*, 32 Cal.2d 406, 417; *Williams* v. *Stillwell* (1933) 217 Cal. 487, 493 [19 P.2d 773]; cf. *Faus* v. *City of Los Angeles, supra*, 67 Cal.2d 350, 360-361.) In the instant case we protect the required stability of title by adhering to the *rules of law* governing ownership of real property. (See *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 456 [326 P.2d 484]; *Smith* v. *McDonald* (1871) 42 Cal. 484, 487-488; *Pioche* v. *Paul* (1863) 22 Cal. 105, 109-110.)

Moreover, our holding leaves open no possibility that owners of valuable property rights of the type herein involved will, contrary to their desire, lose these rights.[23] As we shall point out, abandonment hinges upon the intent of the owner to forego all future conforming uses of his property, and the trier of fact must find the conduct demonstrating the intent ''so decisive and conclusive as to indicate a clear intent to abandon . . . .'' (*Smith* v. *Worn, supra*, 93 Cal. 206, 213.)

B. *Evidence of abandonment: general principles.*

We now consider the propriety of the trial court's finding that all plaintiffs or their predecessors had abandoned their interests in the fugacious minerals underlying section 31. We initially point out that the dominant owner cannot extinguish a profit *a prendre* by abandonment without the concurrence of two elements, his nonuser and his intent to abandon. We then

---

[23]A conscientious owner of such a right can, of course, fully protect himself, e.g., by applying for separate assessment (Rev. & Tax. Code, § 2803, cf. *Smith* v. *Anderson* (1967) 67 Cal.2d 635, 641-642 [63 Cal. Rptr. 391, 433 P.2d 183]).

explain that the trier of fact, before decreeing an abandonment, must find that the owner's conduct clearly and convincingly demonstrates the necessary intent. Following the appropriate precedents, we hold that the evidence does not sufficiently support the trial court's finding that the Gerhard, Solomon, and Mettler plaintiffs had abandoned their interests; we explain that under the circumstances the trial court could not reasonably infer from their conduct in not making use of their property that they intended to abandon it. We affirm the trial court's finding as to the Weber plaintiffs; additional circumstances make reasonable the trial court's inference.

█ We have pointed out, *supra,* that we cannot differentiate profits *a prendre* and easements in terms of the legal consequences stemming from ownership. Accordingly, in determining whether defendants have established an abandonment, we may with propriety consider the cases that discuss abandonment of perpetual[24] easements created by grant.[25]

█ " 'As a general rule, in order to constitute an abandonment of an easement . . . there must be a nonuser accompanied by unequivocal and decisive acts on the part of the [dominant tenant], clearly showing an intention to abandon.' " (*People* v. *Southern Pac. Co., supra,* 172 Cal. 692, 700.)[26] As other cases point out, however, the owner's non-

---

[24]The California courts have held that "[A]bandonment will more readily be found in the case of oil and gas *leases* than in most other instances." (*Hall* v. *Augur* (1927) 82 Cal.App. 594, 599 [256 P. 232]; *Romero* v. *Brewer, supra,* 58 Cal.App.2d 759, 763.) (Italics added.) Such a leasehold interest is an incorporeal hereditament (*Callahan* v. *Martin, supra,* 3 Cal.2d 110, 118), but leasehold interests in oil and gas are, of course, of limited duration. Moreover, a grantor typically gives the lessee the exclusive right to develop and take the oil and limits himself to a compensation based on the production of the lessee. Thus if a lessee fails to drill, it would be unfair to preclude the owner of the servient estate from making other arrangements to gain the hoped-for benefits.

[25]Civil Code section 811, subdivision 4, provides that nonuse for the prescriptive period extinguishes an easement acquired by *adverse user.*

[26]*Smith* v. *Worn, supra,* 93 Cal. 206 at p. 213, stated that the owner of the servient estate must prove, in addition to nonuse and intent to abandon, his reliance on such nonuse and intent and consequent damage. (See also *Nevada Irr. Dist.* v. *Keystone Copper Corp., supra,* 224 Cal. App.2d 523, 532; *Buechner* v. *Jonas, supra,* 228 Cal.App.2d 127, 131.) As explained, however, in *Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co., supra,* 206 Cal.App.2d 421 at p. 437, "The element of reliance has no logical place in the theory of abandonment. Abandonment depends solely upon the acts and intentions of the owner of an easement, for it is he who abandons the easement. The owner of the servient tenement in the instant case does not gain an easement, but merely clears its own title of a former existing obligation." (See also *Faus* v. *City of Los Angeles, supra,* 67 Cal.2d 350, 363-364; *People* v. *Southern Pac.*

user itself may under some circumstances constitute such an act. "Where nonuser is evidence of an abandonment of a right, the question is one of intention, depending on the circumstances . . . ." (*Smith* v. *Worn, supra,* 93 Cal. 206, 213.)[27] "And while nonuser alone does not extinguish the easement, a long continued nonuser is some evidence of an intent to abandon." (*Home Real Estate Co.* v. *Los Angeles Pac. Co., supra,* 163 Cal. 710, 714 [126 P. 972] ; see, e.g., *Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co., supra,* 206 Cal.App.2d 421, 436-437; *Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 232; *Flanagan* v. *San Marcos Silk Co., supra,* 106 Cal.App.2d 458, 463.)[28]

 Although "[t]he acts of the owner of the dominant tenement, to prevent him from [enjoying] an *easement acquired by grant,* must be of a character so decisive and conclusive as to indicate a clear intent to abandon the easement" (*Smith* v. *Worn, supra,* 93 Cal. 206, 213), the question of abandonment is one for the trier of fact. (*Smith* v. *Worn, supra,* 93 Cal. 206, 213.) "It is no doubt true, as claimed by appellant, that mere nonuser, not accompanied by an intent to abandon, will not divest the right of the railroad company to the easement. [Citations.] But in this class of cases as in others, the intention with which an act is done is a question of fact, to be determined by the trial court or jury from a consideration of the conduct of the party and the surrounding circumstances. Where the evidence is such that a finding either way might reasonably be made, the conclusion of the trial court must be upheld under the familiar rule protecting

---

*Co., supra,* 172 Cal. 692, 700; *Home Real Estate Co.* v. *Los Angeles Pac. Co.* (1912) 163 Cal. 710, 716 [126 P. 972] ; *Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 235-236; *Flanagan* v. *San Marcos Silk Co.* (1951) 106 Cal.App.2d 458, 463 [235 P.2d 107]; *Whelan* v. *Zahniser* (1949) 92 Cal.App.2d 770, 775 [207 P.2d 629].)

[27]The Restatement points out that "Conduct from which an intention to abandon an easement may be inferred may consist in a faliure to make the use authorized. Non-use does not of itself produce an abandonment no matter how long continued. It but evidences the necessary intention. Its effectiveness as evidence is dependent upon the circumstances." (Rest., Property, § 504, com. d; see *People* v. *Ocean Shore R.R. Inc., supra,* 32 Cal.2d 406, 419.)

[28]Nonuser need not extend over any substantial period of time. (Cf. *Flanagan* v. *San Marcos Silk Co., supra,* 106 Cal.App.2d 458, 460, 463.) It is essentially a negative element of abandonment, for continued user irrefutably establishes the absence of the concurrent intent. See *Moon* v. *Rollins* (1868) 36 Cal. 333, 338-339 [95 Am.Dec. 181]; Rest., Property, § 504, com. c; see also *Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal. App.2d 222, 232; cf. *Cohn* v. *San Pedro etc. R.R. Co.* (1930) 103 Cal.App. 496, 500 [284 P. 1051].)

from review on appeal findings based on conflicting evidence.''
(*Home Real Estate Co.* v. *Los Angeles Pac. Co. supra,* 163
Cal. 710, 714.)

1. *Evidence of abandonment: plaintiffs Gerhard, Solomon, and Mettler.*

Turning now to the evidence before the trial court on the issue of abandonment, we first examine its sufficiency as to plaintiffs Gerhard, Solomon, and Mettler, who claim as successors of Ashurst stockholders. As to these plaintiffs the trial court ruled that they and their predecessors did not abandon their stock but later abandoned the interests in real property to which they succeeded after Ashurst forfeited its charter. The court found that plaintiffs' predecessors (other than Brandt) defaulted in the quiet title action which Brandt brought in 1917 (action 1870) : ''they failed to include their interests in the estates of those who became deceased, . . . they never set foot on the surface of Section 31, . . . they never attempted to search for oil nor to lease to others to drill for oil, nor to inquire of the Frusetta-Cornwell-Irvine defendants concerning this property, nor to demand of them some interest in the proceeds of oil leases, nor to have their fractional shares set apart and assessed by San Benito County for tax purposes. Prior to the present controversy, no decrees of distribution in the estates of any of plaintiffs' predecessors had been recorded in San Benito County.''

Several California cases which have upheld a trial court's determination that a dominant tenant has abandoned an easement created by grant have found sufficient evidence of the requisite intent by evaluating the implications of nonuser in terms of ''economic exigencies'' and ''external realities.'' (*Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 232; *People* v. *Ocean Shore R.R., Inc., supra,* 32 Cal.2d 406, 419.) Thus, in the *Ocean Shore* cases, the courts sustained findings of abandonment when the evidence showed that the restoration of service would be prohibitively expensive and that effective competition with other carriers was realistically impossible. (*Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co., supra,* 206 Cal.App.2d 421; *Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222; cf. *People* v. *Ocean Shore R.R., Inc., supra,* 32 Cal.2d 406, 419.) In *Home Real Estate Co.* v. *Los Angeles Pac. Co., supra,* 163 Cal. 710, the railroad had constructed and operated on a track paralleling the unused track on the right of way; the railroad's superintendent testified that '' 'as there were no passengers to travel

on [the old line], . . . we quit.' " In *Flanagan* v. *San Marcos Silk Co.*, *supra,* 106 Cal.App.2d 458, the defendant's pipeline, for which it had an easement to carry water, would have needed costly repair work to become serviceable again, and the company had developed alternate sources of supply.

Other California cases point out that the dominant tenant's nonuse does not tend to demonstrate the requisite intent merely because the activation of the easement would produce no *immediate* benefit sufficient to justify the necessary expense. As we pointed out in *Faus* v. *City of Los Angeles, supra,* 67 Cal.2d 350 at p. 363, "the holder must . . . manifest an intent to forswear all *future* conforming uses of the easement." (Italics added.) Thus in *People* v. *Southern Pac. Co., supra,* 172 Cal. 692, we rejected the trial court's finding that the railroad had abandoned its easement: "There is no proof that the needs of commerce during this period were such that . . . the existing or probable immediate future traffic would have justified the cost of building such tracks . . . ." (P. 699.) In *Parker* v. *Swett* (1919) 40 Cal.App. 68 [180 P. 351], the court reversed the judgment for defendants: "The evidence of plaintiff's predecessor in interest is to the effect that he never exercised his right to lay the pipe for the reason that he did not require the water during his ownership of the ranch and the installation of a pipe-line was quite expensive." (P. 74.)[29]

We have pointed out *supra* that "While nonuse alone does not establish intent, the court may consider the length of the nonuse in ascertaining the existence of such intent." (*Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 232.) We must determine whether the trial court could reasonably find the necessary intent on the basis of plaintiffs' 47 years of nonuser,[30] their apparent lack of concern with their

---

[29]The record in the instant case contains no evidence showing "affirmative" conduct on plaintiffs' part on which the trial court could base its finding of intent to abandon. Thus we have no concern with cases examining the intent to be inferred from the dominant owner's physical obstruction of his easement. (E.g., *Buechner* v. *Jonas, supra,* 228 Cal. App.2d 127, 132 (planting hedge over portion of right of way); *Pitcairn* v. *Harkness* (1909) 10 Cal.App. 295, 299 [101 P. 809] (growing crops over right of way); see generally 25 A.L.R.2d 1265, 1289-1293; cf. Civ. Code, § 811, subd. 3.)

[30]The trial court found that Abrams and Brandt conveyed a portion of the oil and gas rights in section 31 to COP in October 1910 and that COP never drilled on the property. The trial court found that Abrams and Brandt conveyed the oil and gas rights to Ashurst in March *1910* and that Ashurst drilled three unproductive wells between *1900* and *1903* (*sic*). Plaintiffs filed their complaints in 1957 and 1958.

interests, and their failure to give any visible indication of intent to make future use of the property.

Abrams and Brandt purchased the Syncline Ranch in 1905, during an "oil boom" in the area. They organized Ashurst in order to obtain financial backing for the contemplated exploration for, and production of, oil and gas. After the corporation's dissolution in 1915, however, the oil interests were no longer owned and managed by a unified corporate structure; instead these interests embraced 148 owners, many of whom, as evidenced by the judgment roll in action 1870, could not be located.

Any one of these owners individually could have entered upon section 31 and explored for oil and gas. (*Callahan* v. *Martin, supra,* 3 Cal.2d 110, 125-126.) In doing so, however, he would, if unsuccessful, have been compelled to bear the entire expense and risk of the operations. (See *Little* v. *Mountain View Dairies, Inc.* (1950) 35 Cal.2d 232, 234 [217 P.2d 416]; cf. *McCord* v. *Oakland Quicksilver Min. Co.* (1883) 64 Cal. 134, 149-150 [27 P. 863, 49 Am.Rep. 686].) If he had succeeded in his endeavor, he could not have excluded from section 31 other cotenants who had desired to drill (*Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, 655; *Callahan* v. *Martin, supra,* 3 Cal.2d 110, 125-126),[31] and, as to the remaining cotenants, he would have been required to render an accounting for the profits (*Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, 655-657).[32]

An extended nonuser, when considered in light of these "economic exigencies" and "external realities" (*Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 232) cannot *by itself* support the trial court's finding of intent to abandon. Although the acquisition of such an interest in oil and gas may be entirely speculative and the owner may well intend to forsake his interest if the "oil boom" which induced his purchase collapses, plaintiffs and their predeces-

---

[31]In *Callahan* we pointed out that "If numerous holders of oil rights in a single parcel of land are unable to agree upon an operating lessee or upon the terms of an oil lease, we are inclined to think that the powers of a court of equity may be invoked to formulate a just and reasonable plan for the development and production of oil upon the land, and to settle the controversy in accordance therewith. But this can be determined as the question may arise in future litigation." (3 Cal.2d at p. 126.)

[32]Of course a coowner could attempt to benefit from his interests yet avoid the risk of nondiscovery if he could obtain a lessee. A potential lessee, however, might well be unwilling to undertake operations in view of the small size of a single owner's interest and the possibility that other cotenants would not ratify the lease.

sors, incurring no significant detriment by retaining their interests, might well have contemplated that the property might again become valuable because of the efforts of others.

In order to protect the owner of an unlimited profit *a prendre* or other incorporeal hereditament against "involuntary" abandonment under circumstances in which conflicting inferences may be drawn from his nonuser we hold that the trial court must find either that the owner's future use of the right could result only from a palpably unsound business judgment[33] or that the owner has given a further indication of his intent to abandon. Applying this principle, derived from the cases cited *supra,* to the instant situation we find no substantial evidence to support the finding that plaintiffs Gerhard, Solomon, and Mettler abandoned their interests in section 31.

### 2. *Evidence of Abandonment*: *Weber Plaintiffs*

As to the Weber plaintiffs, we uphold the trial court's finding of abandonment. Before discussing the sufficiency of the evidence of abandonment, however, we dispose of plaintiffs' contention that the judgment in Brandt's quiet title suit of 1917 renders the issue of abandonment res judicata. (Action 1870.) In his action to quiet title to the Syncline Ranch, Brandt named as defendants the stockholders in several corporations, including those in Ashurst and COP when those corporations forfeited their charters. All of these defendants defaulted, except that a purported trustee for COP filed an answer. The judgment stated that the named shareholders *became coowners* of the interests held by the corporations *at the times the charters were forfeited.*[34]

Even if we assume that the judgment in action 1870 conclusively determined that the shareholders had not abandoned their interests *on the judgment date,*[35] the judgment

---

[33]We would be reluctant to assume that an *individual* abandons his right merely because sound business judgment would call for this action. The intent to abandon is subjective, and we recognize the possibility that personal pride in, and attachment to, property rights may cause an owner to adopt a less functional approach in the management of his possessions.

[34]Elsewhere in the judgment the court states that the partnership of Abrams and Brandt *is* a coowner of a 114,811/366,201¾ interest in the Ashurst property and a 199,500/503,000 interest in the COP property. The partnership is defendants' predecessor in interest.

[35]Plaintiffs assert that the judgment in action 1870 determined the stockholders' interest as of the date that the court entered the judgment. They rely on the provision in the judgment that "None of the defendants [among whom were numerous individuals and corporations other than

would not preclude a finding of abandonment at a later date. Moreover, we may consider the actions and circumstances preceding the prior decree as well as subsequent facts in determining whether plaintiffs have abandoned their interests. (*People* v. *Ocean Shore R.R., Inc., supra,* 32 Cal.2d 406, 418-419; *Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co., supra,* 206 Cal.App.2d 421, 434-435; *Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 234.) "The trial court examined the totality of facts and circumstances not to disprove the findings in the previous case, but to test the *present* force and validity of the intent in the light of its previous history." (*Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 234.)[36]

 The trial court found that the Weber plaintiffs are the successors of the children of Charles M. Weber, who died in 1912. In 1914 the probate court entered its order and decree finally closing Weber's estate; it recited: "The following personal property belonging to said estate and inventoried and appraised therein as of no value . . . has been tendered and offered for delivery and distribution to said distributees [his children: Helen M. Kennedy and Charles M. Weber] but the receipt and acceptance of the same have been refused by

---

the shareholders in Ashurst and COP] *has* any interest in or title to the said property herein described, and affected by this action, except as herein specified; and each of them be and is hereby enjoined from asserting any other interest or any other title than that herein specified." (Italics added.) This statement, however, does not mean that the shareholders in Ashurst and COP other than the partnership of Abrams and Brandt still retained their interests at the date of judgment. Moreover, in contrast to its use of the past tense to describe the ownership of the Ashurst and COP shareholders other than the partnership, the trial court employed the present tense in identifying the owners of other property involved in action 1870. In its conclusions of law the trial court states that the named shareholders of Ashurst and COP "were and *apparently are*" coowners of the corporate property. (Italics added.)

[36]In the *Ocean Shores* cases the railroad had ceased rail service and caused the tracks to fall into disrepair. In an action initiated shortly after the cessation of service the court found that the railroad had not abandoned its right of way. (*Ocean Shore R.R. Co.* v. *Spring Valley Water Co., supra,* 87 Cal.App. 188.) In a subsequent action we held "there has been no resumption of service, and there was evidence that increased motor travel and other factors had made it economically infeasible to operate a railroad. Moreover, there were continued representations that the company was not a public utility, that it was in liquidation, and that it did not intend to engage in business other than that incidental to liquidation. We thus have evidence of subsequent facts which, when considered with the prior circumstances, would support a finding of intent to abandon even though we accept as controlling the determination of that case that there had been no abandonment when [the earlier] action was commenced in 1922." (*People* v. *Ocean Shore R.R., Inc., supra,* 32 Cal.2d 406, 419.)

the distributees[37] on account of said stocks being worthless and of no value, to wit [33,527 shares of Ashurst and 264,400 shares of COP]." In rejecting the stock the heirs thereby gave a positive indication of an intent to renounce their rights[38] (see *Lake Merced Golf & County Club* v. *Ocean Shore R.R. Co., supra,* 206 Cal.App.2d 421, 435, 438; *Ocean Shore R.R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 228; Rest., Property, § 504, com. c.)

Even if we should conclude that these plaintiffs did not in fact abandon their interests by specifically rejecting the shares of Ashurst and COP, we cannot ignore the trial court's finding of corroboration of an intent to abandon by their subsequent conduct. Like the predecessors of plaintiffs in the other actions, they made no use whatsoever of the property for an extended period of time that lengthened into almost a half century. We cannot hold unreasonable the trial court's determination that *in light of their earlier decision* the non-user indicates and confirms their intent to abandon. A further factor demonstrating such intent as to the interests conveyed to COP was that the interests continued to be subject to the COP mortgage, which, the court in action 1870 found, constituted an extant lien on the corporate assets. (Cf. 13 Cal. Jur.2d, Cotenancy, §§ 29, 30.)

Our holding that the trial court properly found that the Weber plaintiffs abandoned their interests in the oil and gas and other fugacious minerals underlying section 31 does not completely dispose of that appeal. The grants to Ashurst and COP included Abrams' and Brandt's interest in certain specified hydrocarbon substances other than oil and gas. Although most of these substances are liquid or semiliquid in their natural state, one such substance possesses nonfugacious

---

[37]Helen M. Kennedy rejected the stock for herself and as guardian of her brother Charles, the other heir, who was 20 at the time. The trial court found that he ratified the action of his guardian upon obtaining majority.

[38]The judgment in action 1870 lists C. M. Weber and C. M. Weber, Trustee, as stockholders in Ashurst at the time of its dissolution in 1915. The Weber referred to is probably the father, who died prior to that time, because Helen M. Kennedy is not listed as a shareholder. Charles M. Weber and Helen M. Kennedy are listed as shareholders in COP at the time of its dissolution in 1912, shortly after the senior Weber died.

But for their renunciation of the stock the heirs would have assumed potential personal liability for the debts of the corporations incurred after the senior Weber's death. (See former Civ. Code, § 322 (Stats. 1905, ch. 339, p. 397); *Western Pac. Ry. Co.* v. *Godfrey* (1913) 166 Cal. 346, 349 [136 P. 284, Ann.Cas. 1915B 825].)

qualities.[39] We have pointed out, *supra,* that the partnership's deed purports to convey a complete possessory estate in the specified minerals, but, because of the fugacious nature of oil and gas, our courts could not give effect to a transfer of the latter substances as corporeal real property but would instead treat the deed as conveying ownership of an unlimited profit *a prendre* in the fugacious minerals. As to any nonfugacious minerals underlying section 31, however, Abrams and Brandt had title to them in place and therefore could convey them as corporeal real property.[40]

We have concluded, however, that the grantors, in conveying their rights in the enumerated minerals in a single deed to each corporation, did not intend to convey two different types of estate in the same instrument. The grantors had the power and right to convey a profit *a prendre* in the nonfugacious minerals. (See Civ. Code, § 802; see also the discussion in *Miller* v. *State, supra,* 121 Conn. 43, 46-48.) In making the conveyance they were primarily concerned with transferring the *oil and gas* rights to the corporations, as is evidenced by the then extant oil boom in the area and by the names of the corporations (Ashurst Oil, Land and Development Company and California Oil Products Company). In treating the incidental conveyance of the asphalt as a conveyance of a profit *a prendre* we are in accord with *Callahan* v. *Martin, supra,* 3 Cal.2d 110, and *Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, in which the interests disputed were rights in oil, gas, and other hydrocarbons; yet this court did not distinguish, or even mention, nonfugacious hydrocarbons in its analysis of the nature of the interests in question.

2. *Adverse Possession*

The trial court concluded that the Frusetta-Cornwell defendants had acquired title to section 31 "in fee" by adverse possession. In support of that conclusion the court found that for over 20 years prior to the instigation of this litigation defendants and their predecessors had improved the

---

[39]Asphalt, for instance, consists "chiefly of hydrocarbons, ranging from hard and brittle to plastic in form." (Webster's New Internat. Dict. (3d ed.).)

[40]"The owner of real property may divide his lands horizontally as well as vertically, and when he conveys the subsurface mineral deposits separately from the surface rights, or reserves them from a conveyance of such surface rights, he creates two separate fee simple estates in the land, each of which has the same status and rank." (*Nevada Irr. Dist.* v. *Keystone Copper Corp., supra,* 224 Cal.App.2d 523, 527 (quartz gold and silver deposits).)

Syncline Ranch, including section 31, by fencing it and conducting cattle operations on it; they had excluded trespassers from the property; they had paid all taxes assessed against section 31, although the mineral estate was not separately assessed. The court also found that for more than five years before the commencement of this action defendants had exercised dominion over the section 31 oil and gas rights by negotiating leases and receiving rentals. These acts, the court determined, were so open and notoriously adverse to the interests of plaintiffs' predecessors as to effectuate an ouster and mature a title in defendants to the entire fee in section 31, including the interests now claimed by plaintiffs.

Plaintiffs contend that no sufficient evidence supports the trial court's finding. They point out that defendants engaged in no visible activity adverse to plaintiffs' claimed interests until 1956, when oil was discovered on section 31. They argue that defendants' recording of several instruments in which they claimed to own without reservation the entire estate in section 31 and their failure to account to plaintiffs for the rentals received from the leases did not give notice to plaintiffs that their alleged cotenants were claiming adversely to them.

We shall explain that the cases hold that the owner's possession of the surface does not necessarily earn property rights, previously conveyed to another, in the oil and gas underlying the surface. We point out that defendants engaged in no *subsurface* activity sufficient to acquire a prescriptive title to the interest previously conveyed to the corporations; we further point out that defendants' *surface* activities were not adverse to plaintiffs' enjoyment of their interests.

Although the courts generally hold that adverse possession of the surface extends to the underlying mineral estate (see cases cited, 35 A.L.R.2d 124, 129-138; 1 Williams & Meyers, Oil & Gas Law, § 224, p. 337; 1 Kuntz, Oil and Gas, § 10.2; 1A Summers, Oil and Gas, § 138, p. 306), continued possession of the surface, following a conveyance of the oil and gas rights apart from the surface, does not establish the possessor's rights against the legal owner. (See cases cited, 35 A.L.R.2d 124, 154-165; 1 Williams & Meyers, *op. cit. supra*, § 224, p. 338; 1A Summers, Oil and Gas, § 138, pp. 307-312.) The reason for the rule lies in the fact that the true owner of a mineral interest would not be alerted to a hostile claim on the part of an occupant who takes no steps to penetrate the surface. (See *Smith* v. *Pittston Co.* (1962) 203 Va. 408, 412

[124 S.E.2d 1]; 1 Williams & Meyers, *op.cit. supra,* § 224.1, pp. 340-341.)

In *Foss* v. *Central Pac. R.R. Co.* (1935) 9 Cal.App.2d 117 [49 P.2d 292], the grantor had deeded the land to plaintiffs' predecessors, reserving to himself a part of apparently nonfugacious mineral rights and necessary easements for mining. Entering the land under a decree of distribution which did not mention the reserved mineral rights, plaintiffs "paid the taxes on the land, made improvements, used a small portion for a family cemetery, granted a right of way for a county road, enclosed the land with fences and excluded trespassers, and leased the property at times for pasturage and grazing." (P. 119.)

In *Foss* the court held: "Where the title to the mineral rights has been severed from the title to the surface, possession of the surface by its owner is not adverse to the owner of the mineral below it. The surface owner cannot acquire title to the minerals by adverse possession based on his exclusive and continued occupancy of the surface alone [citations]. The act of the surface owner in paying the taxes on the land containing the minerals does not constitute adverse possession of the minerals [citation]. The fact that the owner of the minerals does not pay the taxes on the minerals is not in derogation of his claim to their ownership, where the minerals are not separately assessed, and the taxes charged against the land are not increased by reason of the existence of the minerals [citation]. . . . None of the various acts of possession and ownership by the appellants has been adverse to the rights of respondents to the subsurface minerals. The establishment of the family cemetery is urged as a strong point, but there is no assertion of rights to the minerals in this act, and there is no showing that it would ever interfere with mining operations." (Pp. 120-121.)

Thus the courts have indicated that mere possession and ownership of the surface, in the absence of visible activity sufficient to impart to the true owner notice of an adverse claim, does not give rise to *adverse* title to rights in the underlying minerals. Indeed some courts have taken the extreme position that, following a conveyance of the mineral rights, subsurface activity by the surface owner on a part of a tract will not give title by constructive adverse possession to the mineral rights appurtenant to the entire tract (e.g., *Sanford* v. *Alabama Power Co., supra,* 256 Ala. 280, 289-290; *Piney Oil & Gas Co.* v. *Scott, supra,* 258 Ky. 51, 65). Other

courts have held that the development of part of the sub-surface estate under color of title to the entire tract will mature a prescriptive title to the entire mineral estate (e.g., *Vance* v. *Guy* (1943) 223 N.C. 409 [27 S.E.2d 117] (three or four small mines on 375-acre tract); *Diederich* v. *Ware* (Ky. App. 1956) 288 S.W.2d 643 (two producing wells on 56-acre tract)).

Applying these rules to the instant case we conclude that no evidence supports the trial court's finding that defendants acquired a prescriptive title to the oil and gas rights. Defendants' lessees did no drilling on section 31 until shortly before the commencement of the present actions. (See *Graybiel* v. *Burke* (1954) 124 Cal.App.2d 255, 263-264 [268 P.2d 551].) Defendants' execution and recording of leases does not by itself constitute the actual and visible physical enjoyment of the subject rights essential to place the true owner on notice of an adverse claim. (See *West* v. *Evans* (1946) 29 Cal.2d 414, 417, 418 [175 P.2d 219]; cf. *Lundy* v. *Lakin* (1950) 96 Cal.App.2d 221, 223 [215 P.2d 61]; see also *Piney Oil & Gas Co.* v. *Scott, supra,* 258 Ky. 51, 66-67; *Viersen* v. *Boettcher* (Okla. 1963) 387 P.2d 133, 138.)

We recognize that defendants' lessee Hess drilled a dry hole on the Syncline Ranch just outside of section 31 in 1951, but, even if this single action would suffice as a continuous and notorious user for the requisite period, defendants cannot on this basis establish title under the doctrine of constructive adverse possession. (See Code Civ. Proc., §§ 322, 323.) Although defendants held color of title to a complete interest in the oil and gas underlying the Syncline Ranch including section 31[41] their lessee's activity did not intrude

---

[41]A deed describing land by surface boundaries without reservation will convey the grantor's title to the oil and gas rights as well as to the surface estate. (*Standard Oil Co.* v. *John P. Mills Organization* (1935) 3 Cal.2d 128, 132-133 [43 P.2d 797].) A deed that purports to convey a complete interest in land therefore gives ''color of title'' to the mineral estate even though the deed is *ineffective* to convey that title because of a prior conveyance. (*Foss* v. *Central Pac. R.R. Co., supra,* 9 Cal.App.2d 117, 120; *Nevada Irr. Dist.* v. *Keystone Copper Corp., supra,* 224 Cal.App.2d 523, 530; *Jilek* v. *Chicago etc. Coal Co., supra,* 382 Ill. 241, 254; *Diederich* v. *Ware, supra,* 288 S.W.2d 643; *Vance* v. *Guy, supra,* 223 N.C. 409, 413; *Gill* v. *Fletcher, supra,* 74 Ohio St. 295; *Thomas* v. *Young* (1923) 93 W.Va. 555 [117 S.E. 909].) Thus, in the instant case, although the 1924 deed from Halsey to defendants' predecessors did not give color of title to all the oil and gas rights because the conveyance was ''subject to'' the deeds to Ashurst and COP (see *Thomas* v. *Young, supra,* 93 W.Va. 555, 564-565), defendants now have color of title by virtue of decrees of distribution in the Frusetta and

upon the interests now claimed by plaintiffs. The California cases hold that a person in actual possession of only a part of the land to which he has color of title cannot establish ownership of the entire tract by adverse possession unless his *actual* possession infringes upon the presumptive possession of the true owners of the land. Thus in *Wheatley* v. *San Pedro etc. R.R. Co.* (1915) 169 Cal. 505, 516 [147 P. 135], defendant obtained a deed to property, but his grantor had title only to a part of the area described. Defendant's actual possession of that portion to which he had good title, we held, could not give him title by constructive adverse possession to the remaining portion. (See also *Kimball* v. *Stormer* (1884) 65 Cal. 116, 120 [3 P. 408]; cf. *Lundy* v. *Lakin, supra,* 96 Cal. App.2d 221, 223.) [42]

Defendants attempt to sustain the trial court's finding by pointing out that because California regards the oil and gas interests here in dispute as profits *a prendre* or incorporeal hereditaments, the servient owner may extinguish such servitudes by acts other than exploring or drilling for the substances himself. "In a non-ownership state, where the grantee . . . of oil and gas rights acquires only the grantor's . . . right to drill and appropriate, a right in the nature of a *profit à prendre,* an incorporeal hereditament, . . . it would seem, although there is practically no authority, that excluding the grantee . . . would be such an interference with the essence of the right that the statute would begin to run, and the same conclusion would be reached if there were any interference with such right as would give an action to the grantee . . . ." (2 American Law of Property, § 10.7, p. 523; see 1 Kuntz, *op. cit. supra,* § 10.4, pp. 218-219; 1 Williams & Meyers, *op. cit. supra,* § 224.4, pp. 359-360; cf.

Cornwell estates, and a 1940 quiet title decree against Carroll, an oil lessee. (Code Civ. Proc., § 322.) These instruments describe the property as the Syncline Ranch, including "all of Section 31" and make no exception in favor of the rights previously deeded to the corporations.

[42]In view of our conclusion that defendants and their predecessors at no time utilized the rights now claimed by plaintiffs we need not consider plaintiffs' further argument that defendants could not acquire a prescriptive title against their cotenants because no evidence established the requisite ouster of plaintiffs or their predecessors. (See *West* v. *Evans, supra,* 29 Cal.2d 414, 418; *Russell* v. *Lescalet* (1967) 248 Cal. App.2d 310, 313-314 [56 Cal.Rptr. 399]; *Weller* v. *Chavarria* (1965) 233 Cal.App.2d 234, 243 [43 Cal.Rptr. 364]; *Wilkerson* v. *Thomas* (1953) 121 Cal.App.2d 479, 488 [263 P.2d 678]; but cf. *Johns* v. *Scobie* (1939) 12 Cal.2d 618, 624-626 [86 P.2d 820, 121 A.L.R. 1404]; *Akley* v. *Bassett* (1922) 189 Cal. 625, 641-642 [209 P. 576]; *Zolezzi* v. *Michelis* (1948) 86 Cal.App.2d 827 [195 P.2d 835].)

*Nevada Irr. Dist.* v. *Keystone Copper Corp., supra,* 224 Cal.App.2d 523, 532.)

We find no evidence, however, that could support a finding that the profit was "extinguished by the user of the servient tenement in a manner adverse to the exercise of the [incorporeal hereditament], for the period required to give title to land by adverse possession." (*Glatts* v. *Henson* (1948) 31 Cal.2d 368, 371 [188 P.2d 745] (easement).) We find no exclusion of the grantee that would be such an interference with the essence of the right as to start the running of the statute. To extinguish an easement by adverse user the use "must either interfere with a use under the easement or have such an appearance of permanency as to create a risk of the development of doubt as to the continued existence of the easement." (2 American Law of Property, § 8.102, p. 308.) Moreover, "[a]n easement cannot be acquired or extinguished by adverse use unless the party whose rights are affected thereby has knowledge of the adverse nature of such use. This knowledge may be either actual or constructive, resulting from notice either express or implied." (*Clark* v. *Redlich* (1957) 147 Cal.App.2d 500, 508 [305 P.2d 239].)

The facts of the instant case bear no resemblance to those situations in which the servient owner has successfully extinguished an easement by obstructing a specifically defined right of way for the prescriptive period. (*Glatts* v. *Henson, supra,* 31 Cal.2d 368; *Ross* v. *Lawrence* (1963) 219 Cal.App. 2d 229 [33 Cal.Rptr. 135].) If defendants had covered the surface of section 31 with permanent improvements, we would not disturb a finding that the user was adverse to the development of oil and gas. Here, however, defendants' fencing of the Syncline Ranch and their use of the surface of section 31 for cattle grazing was not inconsistent with plaintiffs' alleged right to enter upon the tract and explore for oil. (See *Barker* v. *Campbell-Ratcliff Land Co.* (1917) 64 Okla. 249, 251 [167 P. 468, L.R.A. 1918A 487].) Indeed defendants themselves, through their lessees, were able to use the land to drill for oil and gas in spite of the surface cattle operations.[43]

3. *Laches*

The trial court held that plaintiffs' claims to the interests

---

[43]As to defendants' practice of excluding strangers from the ranch, even if plaintiffs had notice of it, they could not, in the absence of a frustrated attempt to assert their rights, be charged with knowledge that defendants would refuse entry to one holding a legal right to use the property. (Cf. 1 Kuntz, *op. cit. supra,* § 10.4, p. 219.)

were barred by laches. The court found that subsequent to the time that plaintiffs' predecessors had acquired these claims important documents had been lost and many persons who had knowledge of the numerous transactions concerning section 31 had died. The court also found that plaintiffs have possessed a cause of action since the year 1928, when defendants executed a deed of trust to the French-American Corporation describing the entire fee title without reservation. It found that between 1928 and 1957 the value of the oil rights to section 31 greatly increased because of the efforts and expenditures of defendants and their lessees.

Whether or not laches occurred in a particular case primarily presents a question for the trial court (*Austin* v. *Hallmark Oil Co.* (1943) 21 Cal.2d 718, 734 [134 P.2d 777]; *Akley* v. *Bassett, supra,* 189 Cal. 625, 648); when "there are facts from which the trial court may infer that there has been an unreasonable delay, that finding will not be disturbed on appeal." (*Wilson* v. *Grey* (1955) 131 Cal.App.2d 58, 64 [280 P.2d 29].)

A defendant asserting laches on plaintiff's part must show that plaintiff has acquiesced in defendant's wrongful acts and has unduly delayed seeking equitable relief to the prejudice of defendant.[44] "[M]ere lapse of time, other than that prescribed by [statutes of limitations], does not bar relief." (*Maguire* v. *Hibernia Sav. & Loan Soc., supra,* 23 Cal.2d 719, 736 [146 P.2d 673, 151 A.L.R. 1062].)

The crucial point, however, is that laches does not bar the quieting of title if the party asserting the defense fails to demonstrate that he was in adverse possession of the contested property during the period of delay. As stated in *Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co., supra,* 206 Cal.App.2d 421, 443, "Laches has no place in this quiet title action. If [the railroad's title to the right of way] is defective, it is not cured by passage of time while [the railroad] was not in possession." (See *Secret Valley Land Co.* v. *Perry* (1921) 187 Cal. 420 [202 P. 449]; *Wareham* v. *Randolph* (1960) 184 Cal.App.2d 218 [7 Cal.Rptr. 483]; *Wood* v. *Henley* (1928) 88 Cal.App. 441, 460-461 [263 P.

---

[44]The trial court found prejudice in that almost all persons who participated in, or had knowledge of, the transactions concerning section 31 had died or lost their memory. The loss of witnesses is a factor demonstrating prejudice (*Maguire* v. *Hibernia Sav. & Loan Soc.* (1944) 23 Cal.2d 719, 736 [146 P.2d 673, 151 A.L.R. 1062]; *Zakaessian* v. *Zakaessian* (1945) 70 Cal.App.2d 721, 727 [161 P.2d 677]), and the cases do not require that defendant must demonstrate that their testimony would have been favorable to him.

870] ; *Magginis* v. *Hurlbutt* (1920) 49 Cal.App. 460 [193 P. 606].)

In *Secret Valley* defendants' predecessors purchased property from the United States in 1896. The state thereafter instituted void tax proceedings; plaintiff's predecessors redeemed the land and continued to pay all taxes assessed against it. Neither party or their predecessors ever occupied the land. We rejected plaintiff's contention in a quiet title action that defendants' laches barred assertion of their title. We noted that the owner of property need not take prompt steps to remove a cloud on his title in the absence of an openly hostile claim. ''No attack was made upon [defendants'] title until this action was begun. There was no adverse possession. There was not even a notice of hostile claim other than might arise from constructive notice of the issuance of the second certificate of purchase, if the facts show such constructive notice. [Citations.] [Defendants] had a right to rest on the sufficiency of their own claim. If it was good, the other was a nullity, in the absence of an adverse possession.'' (P. 425.) ''A defendant holding the legal title, or a paramount claim to the legal title, is not called upon to take action against a hostile claim which is not of a nature to ripen into a valid adverse title.'' (P. 426.)

In the instant case, as we have pointed out, *supra,* prior to the 1956 drilling, defendants and their lessees did not invade plaintiffs' interests in a manner creating a potential of prescriptive title. Defendants' surface activities were entirely consistent with their ownership of the servient estate and posed no threat to plaintiffs' rights. Although defendants, by recording instruments in which they claimed ownership without reservation of all of section 31, cast a cloud on plaintiffs' title, plaintiffs' delay in seeking to quiet title cannot constitute laches. (*Secret Valley Land Co.* v. *Perry, supra,* 187 Cal. 420, 426.) Defendants' failure to account to plaintiffs for any rentals received under the early oil leases covering section 31 (see *Pico* v. *Columbet* (1859) 12 Cal. 414 [73 Am.Dec. 550] ; cf. *Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, 655-657) cannot support a finding of laches, because in the absence of drilling on section 31 plaintiffs could not be charged with knowledge of any accrued rights. [45] In summary

---

[45]Plaintiffs' right to have those rentals covered in an accounting, however, may be barred by the statute of limitations. (See *Willmon* v. *Koyer* (1914) 168 Cal. 369, 372 [143 P. 694, L.R.A. 1915B 961]; cf. *Graybiel* v. *Burke, supra,* 124 Cal.App.2d 255, 265.)

we find no evidence to support the trial court's finding that plaintiffs' action is barred by laches.[46]

4. *The Suits to Quiet Title: Effect of Actions 5362 and 5591*

The trial court found that: "On August 13, 1952, certain of the defendants herein filed San Benito County Action No. 5362 to quiet title to the Syncline Ranch including Section 31, against the claims of all persons. A lis pendens was duly recorded in San Benito County and summons was posted on the ranch property. A decree quieting title was entered on June 9, 1953, and duly recorded in San Benito County. In 1954 certain defendants herein filed San Benito County Action No. 5591 to quiet title to an undivided one-half interest in the Syncline Ranch in fee, including Section 31, against named persons and the claims of all persons. A lis pendens was duly recorded in San Benito County and a decree quieting title to an undivided one-half interest in the ranch was entered in February 1955, and duly recorded in San Benito County. . . . None of the plaintiffs . . . nor their predecessors had knowledge of or were named other than as unknown persons or served with process other than by publication in San Benito County Actions Nos. 5362 and 5591. That it is not known whether the interests of the present [plaintiffs'] predecessors were sold as ordered by the Court in the judgment in Action 1870, nor if such sales were made, to whom said interest passed by said sales; the holders of such title were properly determined to be 'unknown persons' within the meaning of C.C.P. 749 and sued and served as such by publication in said actions. The judgments in Actions 5362 and 5591 are now final and quiet title to the property involved in the present actions in the present defendants. That by reason thereof plaintiffs have no right, title nor interest in nor claim to the real property described in the complaints . . . ."

Code of Civil Procedure section 749 et seq. set forth a procedure whereby one who "has been in the actual, exclusive and adverse possession of such property continuously for 20 years prior to the filing of the complaint, claiming to own the same in fee against the whole world, and who . . . has paid all taxes of every kind levied or assessed against the property

---

[46]Defendant Shell Oil Company claims that in any event certain plaintiffs' laches are demonstrated by their failure, after learning of the discovery of oil on section 31, to assert their claims for a period less than one year, during which time Shell expended considerable money in connection with the property. The trial court made no finding as to the effect of this shorter delay.

and which were payable during the period of five years continuously next preceding the filing of the complaint" may determine "the adverse claims to and clouds upon title to real property . . . . The said complaint may include as defendants in such action, in addition to such persons as appear of record to have, all other persons who are known to the plaintiff to have some claim or cloud on the real property described in the complaint adverse to plaintiff's ownership, and other persons unknown claiming any right, title, estate, interest or lien in such real property, or cloud upon the title of plaintiff thereto . . . ." (Code Civ. Proc., § 749.)

The court must issue a summons, a copy of which the plaintiff shall post on the property. "All . . . defendants residing in the State of California, whose place of residence is known to the plaintiff shall be served personally with said summons . . . ." All defendants whose residence is unknown, all defendants residing outside of the State, and all unknown residents are to be served by publication. Nonresident defendants whose names and addresses are known must be mailed a copy of the summons. A copy addressed to defendants at the county seat of the county in which the action is brought must be sent to defendants whose names but not addresses are known. Service is deemed complete as to these latter classes of defendants, and as to unknown defendants upon publication of the summons pursuant to Government Code section 6064. (Code Civ. Proc., § 750.)

"[T]he court shall proceed to hear the case as in other cases and shall have jurisdiction to examine into and determine the legality of plaintiff's title and of the title and claim of all the defendants and of all unknown persons, and to that end must not enter any judgment by default, but must in all cases require evidence of plaintiff's title and possession, and . . . must thereafter direct judgment to be entered in accordance with the evidence and the law. . . . The judgment after it has become final is conclusive against all the persons named in the summons and complaint who have been served and against all unknown persons as stated in the complaint and summons who have been served by publication . . . ." (Code Civ. Proc., § 751.)

■ Plaintiffs attack the conclusive effect of the two judgments on several grounds, only one of which we need consider. We hold that plaintiffs' predecessors were "known" to have a claim to certain property rights in section 31; since defendants failed to name them in the com-

plaints and serve them with process, the two judgments do not foreclose plaintiffs' claims to these rights. (Code Civ. Proc., § 751.)

 Our courts have clearly indicated that a judgment obtained under section 749 et seq. is not binding as to a person "known" to plaintiff to have an adverse claim, if that person is not named and served. (*Manuel* v. *Kiser* (1949) 94 Cal.App.2d 540, 545 [210 P.2d 918]; see *Smith* v. *McDaniel* (1964) 228 Cal.App.2d 275 [39 Cal.Rptr. 544]; *O'Connor* v. *Rumiano Bros. Co.* (1958) 157 Cal.App.2d 483, 489-490 [321 P.2d 122].) In these cases the party seeking to avoid the conclusive effect of the decree claimed to have been in actual hostile possession of the property at the time the action was brought but had not been named in the complaint or served with process. The court in *Manuel* relied on "the general rule that a party in the actual possession of real property cannot be regarded as an 'unknown' person so as to be bound by a decree based upon published service." (94 Cal.App.2d 540 at p. 545.)

Other than to describe a party openly in actual possession as "known," the courts have not indicated what means of knowledge must be asserted against the plaintiff in a section 749 action in order to secure an *in rem* decree. In *Title etc. Restoration Co.* v. *Kerrigan* (1906) 150 Cal. 289 [88 P. 356, 119 Am.St.Rep. 199, 8 L.R.A. N.S. 682], the test case on the McEnerney Act,[47] the court held that "known owners" are those "who could with reasonable diligence be ascertained and found." (P. 317.) "We have no doubt that where the statute is thus careful to secure actual notice to known claimants, it should not be construed as intended to permit a plaintiff to willfully or negligently close his eyes to the means of knowledge and thus secure a decree by publication and posting alone, as against persons whose identity he might have learned by the use of due effort." (P. 318.) We hold that this standard of "reasonable diligence" applies in connection with "known" claimants in an action brought under section 749 et seq.

Conceding, as they must, that they cannot show the "reasonable diligence" required under section 749 et seq. unless they undertake some examination of the title records, defendants argue that in view of the statutory requirement that a

[47] The McEnerney Act (Code Civ. Proc., § 751.01 et seq., first enacted in 1906) was designed to reestablish the recording system following the San Francisco earthquake.

plaintiff under this section or his predecessors possess the property for 20 years and pay the assessed taxes for 5 years, such a plaintiff need only examine title records dated within 20 years of the commencement of the action and tax records within 5 years of that time.[48]

■ We cannot accept defendants' construction. Section 749 states that "The said complaint may include as defendants in such action, *in addition to such persons as appear of record to have*, all *other* persons who are known to the plaintiff to have, some claim . . . ." (Italics added.) This language indicates that persons who appear of record at any time to have some claim to the property are "known" persons who cannot be served merely by publication.[49]

Needless to say, we do not hold that a section 749 plaintiff must pursue every missing link in the chains of title or trace every stray deed recorded since the first volume of deeds. Such a requirement would defeat the intent of the Legislature to permit a party occupying and using the property for a given period to obtain a marketable title. Thus, if we held that a plaintiff must trace all successors from a claimant appearing of record over such a period as, for example, 100 years, even though a further disposition of the claim did not appear of record, we would impose in some instances an intolerable burden.

■ Nevertheless, although the question of "reasonable diligence" is one for the trier of fact, we do not find sufficient evidence in the instant case to foreclose plaintiffs' rights under section 751. In bringing the 1952 and 1954 quiet title actions, defendants should have known of the 1910 deeds to the corporations and of the judgment in action 1870 listing the interests of the stockholders at the time of the charter forfeitures. To meet the standard of reasonable diligence they

[48]Under Code of Civil Procedure sction 749.1 a plaintiff may bring an action in the identical manner and with the identical effect as one brought under section 749 if the plaintiff and his predecessors have possessed the land continuously for 10 years prior to the commencement of the action and have paid the assessed taxes for the 10-year period. As to an action brought under section 749.1 we presume that defendants would contend that a plaintiff need only examine the title records and tax records covering a 10-year period preceding the commencement of the action.

[49]Defendants' proposed construction would in any event necessitate an extended search of the title records inasmuch as all instruments setting forth some claim recorded within the 20-year period would not necessarily appear in a chain of title from the person holding the title claimed under by the section-749 plaintiff 20 years before the commencement of the action.

were obligated to undertake some effort to locate the stock-holders or their heirs. Although, as pointed out by the trial court, "it is not known whether the interest of the present [plaintiffs'] predecessors were sold as ordered by the Court in the judgment in Action 1870, nor if such sales were made, to whom said interest passed by said sales . . . ," the very absence of evidence of the sale should have alerted defendants to the shareholders' "claim or cloud on the real property described in the complaint."

5. *"Cross-examination" of George Frusetta*

 Plaintiffs contend that they were deprived of their right to "cross-examine" George Frusetta as an adverse party under former Code of Civil Procedure section 2055.[50] (Now see Evid. Code, § 776, subd. (a).)

In presenting their case in chief plaintiffs called George Frusetta as a witness on February 14, 15, 16, and 19, 1962. Plaintiffs' attorneys then sought to question him about whether he knew that at the time his father purchased the Syncline Ranch the oil and gas rights in section 31 had been transferred to the corporations. The trial court expressed doubts as to the relevancy of this line of questioning and ruled that the evidence, if relevant, could more appropriately be presented during plaintiffs' rebuttal. Plaintiffs' attorneys did not question Frusetta further and defense counsel asked him no questions. The trial court excused Frusetta from the stand but told him that on 48 hours' notice he could be called again.

In March 1962 Frusetta, who was then 75 years old, was hospitalized and underwent an operation, following which he developed a serious infection. In May 1962 his physician testified in court that further participation in courtroom proceedings would endanger Frusetta's life. The trial court decided not to order him to appear again as a witness; instead, it gave plaintiffs permission to prepare questions to be submitted to Frusetta by the court reporter after the court had ruled on any objections to the questions. Although plaintiffs did not object to this procedure at the time of the court's ruling, they did so following the time set for submission of questions to the court, offering instead to examine Frusetta at his home or in other surroundings. The trial court adhered to its original ruling, and plaintiffs submitted no questions.

---

[50]That section provided in part: "A party . . . may be examined by the adverse party as if under cross-examination . . . . ''

Plaintiffs now claim they were denied their right to cross-examine Frusetta. This is not a case, however, in which a witness' direct testimony remains untested by the probe of cross-examination; defendants' attorneys did not call or question Frusetta. ▮ The purpose of former section 2055 was to permit one party to call and question an adverse party without the much-condemned disadvantage of being bound by the adverse party's testimony. (Witkin, Cal. Evidence (2d ed. 1966) pp. 1098-1099.) The section gave no absolute right to examine a witness claiming adversely; plaintiffs can no more claim a complete right to examine an adverse party unavailable because of illness (cf. Evid. Code, § 240, subd. (a)(3)) than can defendants vindicate a right to examine plaintiffs' deceased predecessors.

The trial court found that Frusetta would be too ill to testify in court during the expected duration of the trial; this finding cannot be disturbed on appeal. The court outlined certain arrangements for obtaining any further testimony; plaintiffs have not shown that the court abused its discretion in failing to allow the procedure belatedly suggested by plaintiffs.

Moreover, plaintiffs suffered no prejudice because of Frusetta's illness. Even if Frusetta's prior knowledge of the Ashurst and COP interest would be relevant to any issue properly in this case, plaintiffs questioned him at length on this subject in his deposition, which was in evidence at the trial.

6. *Class Action (S.F. 21806)*

The Weber plaintiffs in S.F. 21806 contend that the trial court erred in dismissing a class action brought by them. In their first cause of action, as amended, plaintiffs alleged ownership of certain undivided fractional interests in mineral rights underlying section 31 (see fn. 2, *supra*.) In their second cause of action, as amended, plaintiffs claimed to bring ''this action on its own behalf, and for and on behalf of the owners of the remaining undivided fractional interest in the aforesaid real properties. Plaintiff and said other remaining owners constitute a class so numerous as to make it impracticable to bring them before this court. There are common questions of law and fact affecting the several rights of the members of said class and a common relief is sought. Plaintiff fairly insures the adequate representation of all the members of said class.''

The trial court found that "[e]ach claim of each purported class member presents individual and important problems. Each claimant must trace his title from a date on or before 1912 in the case of COP and 1915 in the case of Ashurst until 1957, a period of 42-45 years. Problems incident to abandonment, divorce, bankruptcy, succession, laches, estoppel, and the effect of several intermediate quiet title suits and foreclosures would affect each claimant's title individually and with divers results. The members of the purported class interested in prosecuting their claims are not so numerous as to require a class action as opposed to intervention. A large number of said persons had actual knowledge of the pendency of this litigation prior to the trial but none took any steps to intervene individually or as members of the class until the first day of trial . . . ."

 We uphold the trial court's ruling that the questions raised in these cases were not appropriate for a class action.[51] We have recently pointed out that "two requirements must be met in order to sustain any class action: (1) there must be an ascertainable class [citations]; and (2) there must be a well defined community of interest in the questions of law and fact involved affecting the parties to be represented [citations]." (*Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 704 [63 Cal.Rptr. 724, 433 P.2d 732].)

"Applicable precedents indicate that in observing the ascertainable class requirement they are at the same time giving recognition to the principle that a group of individuals' rights to recover, each of which is based on a separate set of facts, cannot be determined by a judgment in a class action." (*Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, 704.) "[W]hether there is an ascertainable class depends in turn upon the community of interest among the class members in the questions of law and fact involved." (P. 706.)

 Although as to all the shareholders of the corporations and their successors, many common questions of law and fact must be resolved before a court can determine definitively the ownership of the mineral rights underlying section 31,[52]

---

[51]Code of Civil Procedure section 382 provides in part: "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the Court, one or more may sue or defend for the benefit of all."

[52]For example, the legal principles raised by the present parties and ruled upon by the trial court would in most instances commonly affect the rights of members of the class. Moreover, many of these principles have been applied to *defendants'* conduct, rather than to plaintiffs'. (E.g., adverse possession.)

we point out that in the instant case "every member of the alleged class would have to litigate numerous and substantial questions determining his individual right to recover against the named . . . defendants following the rendering of a 'class judgment' which determined in plaintiffs' favor whatever questions were common among the plaintiffs sought to be represented as a class." (*Chance* v. *Superior Court* (1962) 58 Cal.2d 275, 285 [23 Cal.Rptr. 761, 373 P.2d 849] ; see *Weaver* v. *Pasadena Tournament of Roses Assn.* (1948) 32 Cal.2d 833, 838-840, 842-843 [198 P.2d 514].) As noted by the trial court, each alleged member of the class would be required to establish his individual deraignment of title from the shareholders, a difficult task in view of the failure to use the recording system. Moreover, the defendants would undoubtedly raise the defense of abandonment of the mineral interests as to each alleged member of the class, which, as pointed out *supra*, creates a factual issue as to the individual owner's intent.

Finally, we find no "substantial benefits resulting from class litigation . . . ." (*Daar* v. *Yellow Cab Co.*, *supra*, 67 Cal.2d 695, 713.) The plaintiff in *Daar* sought to bring a class action to recover overcharges by defendant's taxicabs; we noted that the unavailability of a class action would in effect preclude recovery by the individual members of the class, because the amount each member could recover was minute. Furthermore, if a large number of the class chose to litigate, "a multiplicity of legal actions dealing with identical basic issues will be required in order to permit recovery by each of several thousand taxicab users. The result would be multiple burdens upon the plaintiffs, the defendant and the court." (Pp. 714-715.)

In *Chance* v. *Superior Court*, *supra*, 58 Cal.2d 275, plaintiffs, who owned a note in default secured by a trust deed, sought judicial foreclosure on their behalf and on behalf of other note owners who held trust deeds on parcels of property in the same tract. In upholding the propriety of the class action we noted that the land subject to the deeds of trust was probably more valuable as a unit and that "[t]he instant class foreclosure action is the only procedure presently suggested to be readily available by which all of the parcels of land securing the present 2,139 trust deed notes may be sold as a unit." (P. 291.)

In the instant case, however, the class action would provide no benefits similar to those discussed in *Daar* and *Chance*; plaintiffs have not alluded to any substantial advantage which

would result from the class action. Since plaintiffs testified that in spite of diligent effort they have been unable to locate most of the remaining shareholders or their heirs, a class action could not substantially clarify the state of the title to the oil and gas rights. We conclude that the trial court could properly dismiss the class action.

### 7. *The Hollister Bank Mortgage*

The trial court found that ''The interest in Section 31 acquired by Ashurst and COP and now claimed by plaintiffs was subject to the lien of the purchase money mortgage for $17,500 given by Brandt and Abrams to secure the unpaid balance of the purchase price for the ranch. The rights of the mortgagee under that mortgage were transferred to the Hollister Savings Bank and the lien of the mortgage was from time to time renewed. The balance of the purchase price for the ranch was not paid and in May 1921, the bank foreclosed its mortgage. The money to satisfy the bank mortgage and the decree of foreclosure was provided by Antonio Frusetta and Warren Cornwell, the predecessors of defendants, as part of the price which Frusetta and Cornwell paid for the ranch. Accordingly, the rights of the bank under the mortgage and the decree of foreclosure would pass to Frusetta and Cornwell to the extent necessary for their protection. Since, however, the title to the fractional interests in the oil rights in Section 31 purchased by Frusetta and Cornwell was clear of any claims of plaintiffs' predecessors, no interest in the mortgage or decree of foreclosure passed to Frusetta and Cornwell.''

Defendants contend that the trial court erred in holding that they acquired no interest in the mortgage. They take the position that because they furnished the funds with which the Hollister Bank mortgage was liquidated they were subrogated to the rights of the bank. Since they took possession of section 31 they were mortgagees in possession, and Code of Civil Procedure section 346 precludes redemption following five years of adverse possession by a mortgagee in possession.

We need not, however, consider defendants' claims of error in this respect, since we have concluded that the judgment of foreclosure entered in connection with the Hollister Bank mortgage did not cover the mineral interests underlying section 31 held by the shareholders.

Abrams and Brandt executed a purchase money mortgage for $17,500 to the Ashursts in 1905 covering the entire Syncline Ranch, which included section 31; the Ashursts assigned this mortgage to the Hollister Savings Bank, and in 1908

Abrams and Brandt executed and recorded a deed of trust to bank officials covering the mortgaged property. Subsequently in 1910 Abrams and Brandt conveyed the interests herein disputed to the corporations[53] and recorded the deeds on April 2 and November 25 of that year. On November 30, 1910, Abrams and Brandt executed a promissory note for $11,500 and a mortgage to the Hollister Bank covering the Syncline Ranch; on the same date the bank officials reconveyed the ranch to Abrams and Brandt pursuant to the deed of trust. These documents were recorded in 1911. In 1915 Abrams and Brandt executed a note for $17,000 and a mortgage securing the note on the Syncline Ranch to the bank; the bank shortly thereafter acknowledged satisfaction of the November 30, 1910, mortgage.

If we regard the 1910 or 1915 mortgage instrument as definitive of the property subject to the lien, the corporations' property interests were not subject to the mortgage, since documents recorded prior to the execution of these mortgages evidenced that Abrams and Brandt no longer owned certain mineral rights underlying section 31. If, on the other hand, the bank and the partners, by executing the 1910 and 1915 instruments, intended to renew or extend rather than to pay or discharge the prior mortgage and debt, the corporate property would have continued to be subject to the 1908 deed of trust.[54]

Although "[t]he necessary agreement to accept the renewal instruments in payment and discharge of the prior debt and lien is not necessarily established by evidence, standing alone, that the old mortgage has been released of record. . . ." (*Bowden* v. *Bank of America* (1950) 36 Cal.2d 406, 410-411 [224 P.2d 713]), we find no evidence indicating that the bank and the partners had agreed in the 1910 and 1915 transactions to renew rather than discharge the earlier obligations.[55]

The 1915 notation of satisfaction of the 1910 mortgage constitutes persuasive evidence of an agreement to discharge

[53]The conveyance to COP states that the rights are subject to the 1908 deed of trust; that to Ashurst does not mention the deed of trust but since the trust deed was recorded prior to the conveyance the transferred rights are also subject to the trust deed. (33 Cal.Jur.2d, Mortgages, § 251.)

[54]The corporations were not parties to the 1910 and 1915 mortgage instruments; thus they could be bound only by the 1908 deed of trust. (See *Copp* v. *Millen* (1938) 11 Cal.2d 122, 127 [77 P.2d 1093]; 33 Cal. Jur.2d, Mortgages, § 250.)

[55]Compare *Bowden* v. *Bank of America, supra,* 36 Cal.2d 406 (chattel mortgage held to be consolidation and renewal of earlier series of se-

the earlier mortgages, when considered with the following factors: (1) The Hollister Bank, in its action to foreclose the "1915" mortgage did not name as defendants all of the shareholders in Ashurst and COP, although it did name some who had other interests in the Syncline Ranch; (2) Brandt, one of the original mortgagors, in his complaint in action 1870 refers to the "1915" mortgage held by the Hollister Bank (as pointed out, *supra*, the 1908 mortgage would control the rights and liabilities of the shareholders); (3) the court in rendering judgment in action 1870 did not state that the corporate assets were subject to the lien of the Hollister Bank mortgage, although the court was aware of that mortgage and although, in the case of COP, the court found that the corporate assets were subject to the lien of the COP mortgage.

### 8. *Plaintiff Gerhard's Acquisition of His Claims*

The Frusetta-Cornwell defendants contend that Joseph Gerhard, plaintiff in S.F. 21805, cannot establish title against them because he obtained his interest in section 31 illegally: (1) by the unlawful practice of law; and (2) by the issuance of securities without a permit from the Corporations Commissioner. As we shall explain, we need not inquire into the legality of Gerhard's conduct because the complaining defendants are strangers to the transactions between Gerhard and his grantors and therefore may not challenge them.

Defendants describe Gerhard's activities as follows: at the time he learned of the discovery of oil on section 31 he possessed no interest in the property. Nevertheless he undertook research on the title to the mineral rights. Contacting many of the successors of the shareholders in Ashurst and COP, he or his attorney informed them of a possible claim to the oil-producing property and endeavored to acquire their interest. In most of the instances in which Gerhard successfully obtained an assignment and quitclaim deed he did not recompense his grantors with a fixed consideration but rather promised to undertake at his expense legal proceedings to establish the claim and to transfer to his grantors a percentage of his recovery.

Defendants argue that these activities, conducted by a person not an attorney, constituted the unlawful practice of

curity instruments); *Copp* v. *Millen, supra,* 11 Cal.2d 122 (mortgagee could offer evidence of mistake in order to avoid effect of satisfaction of record on earlier mortgage); *Pacific Nat. Agr. Credit Corp.* v. *Wilbur* (1935) 2 Cal.2d 576 [42 P.2d 314] (testimony that plaintiff mortgagee intended second chattel mortgage to operate as a renewal).

law as condemned in *Estate of Butler* (1947) 29 Cal.2d 644 [177 P.2d 16, 171 A.L.R. 343]. In that case an "heir-hunter" solicited a decedent's heirs, who executed powers of attorney and assignments of one-third of their interest in his favor. The heirs later sought to avoid the assignment and receive their full distributive share of the estate. The probate court upheld the assignment, but this court found it void.

This court held, "The invalidity of respondent's claims stems from the nature of the agreements which he solicited from appellants, which agreements are typical of those used in his general practice of soliciting beneficiaries of decedents' estates. [R]espondent admittedly conducts his business in the following manner: by contacting and soliciting the heirs, securing their authorization to appear for them, and employing counsel to represent them under powers of attorney or assignments. Thus, as a nonlawyer acting for prospective beneficiaries under agreements providing for his paying 'any and all expenses incident to the doing of the things he is authorized to do by said power of attorney, including attorneys' fees and court costs, respondent assumes complete control of litigation instituted on behalf of the beneficiaries through attorneys hired by him and becomes a 'middleman' intervening for profit in the conduct of legal proceedings." (29 Cal.2d at p. 647.) "Such is the nature of the undertakings which are here condemned as constituting the unlawful practice of the law and as contrary to the public policy of this state." (*Id.* at p. 652.)

We need not decide whether Gerhard's activities, as described by defendants, fall within the penumbra cast by *Estate of Butler.* We hold that defendants, being strangers to the agreements between Gerhard and his predecessors, cannot shield themselves from inquiry into the legality of their use of the property in question by diverting attention to Gerhard's conduct.[56]

Adequate and well-established sanctions other than that proposed by defendants will serve to combat the evil of unlawful practice of law. (Cf. *Keller* v. *Thornton Canning Co.* (1967) 66 Cal.2d 963, 966-967 [59 Cal.Rptr. 836, 429 P.2d 156]; *Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 151 [308 P.2d 713].) ▮ A person not an active member of the State Bar who practices law commits a misdemeanor.

---

[56] *Estate of Butler* involved a dispute between the heirs and the "heir-hunter"; no persons not parties to the illegal agreement were concerned.

(Bus. & Prof. Code, § 6126; see *People* v. *Ring* (1937) 26 Cal.App.2d Supp. 768 [70 P.2d 281].) Moreover, a person illegally contracting to practice law may not recover compensation for his services. (*Agran* v. *Shapiro* (1954) 127 Cal.App.2d Supp. 807, 826-827 [273 P.2d 619].)

California prohibits the unlawful practice of law not to discourage the champertous fomenting of litigation (cf. *Martin* v. *Freeman* (1963) 216 Cal.App.2d 639, 641-642 [31 Cal. Rptr. 217]) but to afford protection against persons who are not qualified to practice the profession. Gerhard's predecessors, rather than defendants, would be the person entitled to the protection afforded by the proscription.

We are aware of the time-honored principle that generally in a quiet title action the plaintiff can prevail only by the establishment of his own title and not by reliance upon a weakness in defendant's title. (See 41 Cal.Jur.2d, Quieting Title, § 24.) The cases, however, more accurately state that plaintiff must prove a title in himself superior to that of defendant. (*Di Nola* v. *Allison* (1904) 143 Cal. 106, 115 [76 P. 976, 101 Am.St.Rep. 84, 65 L.R.A. 419]; see *Central Nat. Bank* v. *Bell* (1936) 5 Cal.2d 324, 328-329 [54 P.2d 1107].) Thus defendant may not defeat plaintiff's action by claiming that plaintiff obtained his interest by defrauding his grantor as long as defendant himself does not also claim title from plaintiff's grantor. (Cf. *Regoli* v. *Fancher* (1937) 19 Cal. App.2d 673, 675-676 [66 P.2d 214].) In *Bonninghausen* v. *Hansen* (1943) 305 Mich. 595 [9 N.W.2d 856], the defendant in possession in a quiet title action alleged that the plaintiff had obtained his title by fraud on his predecessor, but the court refused to entertain this defense: "[Plaintiff's predecessor] is not a party to this suit, and the question as to whether or not plaintiff obtained the quitclaim deed from him through fraud, is not before us. In any event, defendant could not create a superior title in herself through plaintiff's alleged fraud . . . ." (305 Mich. at p. 605.)[57]

Defendants also contend that Gerhard shows no enforceable interest in the property because he acquired his claims from his predecessors in violation of the California Securities Law. Not being parties to the alleged illegal transactions, however, defendants may not raise this issue. As

---

[57]In *Faus* v. *Pacific Elec. Ry. Co.* (1956) 146 Cal.App.2d 370 [303 P.2d 814], the record showed that the beneficiaries of a trust had quit-claimed their interest in certain property to plaintiff. Plaintiff agreed

we held in *Austin* v. *Hallmark Oil Co., supra,* 21 Cal.2d 718 at page 727, "It is apparent also that defendants are in the position of third parties having no interest with respect to the alleged issuer or buyer and cannot therefore raise the question of compliance with the act. . . ."

The judgment in S.F. 21806 is reversed as to Joseph M. Gerhard and affirmed as to all other parties. The judgments in S. F. 21805, 21807, and 21808 are reversed.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Schauer, J.,\* concurred.

The petitions of the plaintiff and appellant in No. 21805 and the defendant and appellant in No. 21806 and of the plaintiffs and appellants in No. 21806 for a rehearing were denied September 5, 1968, and the opinion and judgment were modified to read as printed above. Schauer, J.,\* sat in place of Sullivan, J., who deemed himself disqualified, McComb, J., was of the opinion that the petitions should be granted.

Another petition by defendant and appellant in No. 21806 for a rehearing was denied October 3, 1968. Schauer, J.,\* sat in place of Sullivan, J., who deemed himself disqualified. McComb, J., was of the opinion that the petition should be granted.

.

---

in return to prosecute the necessary litigation to quiet title to the property and to pay all expenses of the litigation including attorneys' fees; he would receive one-half the property recovered as compensation. (P. 377 fn. 5.) In rejecting defendant's contention that the trial court in a quiet title action erred in refusing to hear evidence that plaintiff had illegally acquired his title the District Court of Appeal pointed out that the superior court having jurisdiction over the trust had authorized the conveyance and further stated: "The defense of illegality, although open to the parties and those claiming under them, cannot as a general rule be invoked by third persons. [Citations.] The defense is raised by defendant, a stranger, solely to prevent the enforcement of valid conditions subsequent in deeds executed to defendant and its predecessor in interest, the terms of which have been admittedly broken by defendant. The court did not err in excluding the evidence." (P. 378.)

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.